# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT
_____

Nos. 09-2247/2462
_____

| | | |
|---|---|---|
| Kevin Williams; Pat Williams, | * | |
| | * | |
| Plaintiffs - Appellees/ | * | |
| Cross Appellants, | * | |
| | * | |
| v. | * | Appeals from the United States |
| | * | District Court for the District |
| National Football League; | * | of Minnesota. |
| John Lombardo, M.D., | * | |
| | * | |
| Defendants - Appellants/ | * | |
| Cross Appellees, | * | |
| | * | |
| Brian Finkle, | * | |
| | * | |
| Defendant, | * | |
| | * | |
| Adolpho Birch, | * | |
| | * | |
| Defendant - Appellant/ | * | |
| Cross Appellee. | * | |
| _____ | * | |
| | * | |
| National Basketball Association; | * | |
| National Hockey League; | * | |
| United States Anti-Doping Agency; | * | |
| Major League Baseball, | * | |
| | * | |
| Amici on behalf of | * | |
| Appellant. | * | |

No. 09-2249

National Football League Players     *
Association,     *
    *
        Plaintiff - Appellant,     *
    *
    v.     *
    *
National Football League; National     *
Football League Management Counsel,     *
    *
        Defendants - Appellees.     *
    *

_____

Submitted: August 18, 2009
Filed: September 11, 2009

_____

Before MURPHY, BENTON, and SHEPHERD, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

In these consolidated appeals, the National Football League (NFL), Dr. John Lombardo, Independent Administrator of the Policy on Anabolic Steroids and Related Substances, and Adolpho Birch, the NFL's Vice President of Law and Labor Policy, appeal the district court's[1] order, concluding that the Minnesota statutory claims alleged by Kevin Williams and Pat Williams of the Minnesota Vikings (collectively,

_____

[1]The Honorable Paul A. Magnuson, United States District Judge for the District of Minnesota.

"the Players") are not preempted by section 301 of the Labor Management Relations Act ("section 301" or "LMRA"), 29 U.S.C. § 185. The Players cross-appeal the district court's order concluding that their Minnesota common law claims are preempted by section 301. In addition, the National Football League Players Association (the "Union"), the certified collective bargaining representative of all NFL players, appeals the district court's order confirming the arbitration awards which upheld the Players' suspensions. We affirm in all respects.

I.

The NFL is an unincorporated association of member clubs which own and operate professional football teams. The NFL promotes, organizes, and regulates professional football in the United States. Players in the NFL enter into a contract with a member club, not the NFL. NFL Players Association, NFL Collective Bargaining Agreement 2006-2012, App. C at 248 (2006) [hereinafter CBA]. On March 8, 2006, the National Football League Management Council (NFLMC), which is the sole and exclusive bargaining agent of the member clubs, and the Union entered into the NFL Collecting Bargaining Agreement 2006-2012 (the "CBA"). The CBA expressly incorporates the Policy on Anabolic Steroids and Related Substances (the "Policy").[2] Id. art. XLIV, § 6(b). The CBA provides that "all players, Clubs, the [Union], the NFL and the [NFLMC] will be bound hereby." Id. art. II, § 1.

The Policy "is conducted under the auspices of the [NFLMC]." NFL Players Association, National Football League Policy on Anabolic Steroids and Related Substances, § 2 (2008) [hereinafter Policy]. It is "directed" by Dr. Lombardo as "Independent Administrator." Id. The Policy also provides for a "Consulting Toxicologist," Dr. Bryan Finkle. Id. The Policy bans NFL players from using a

---

[2]The Policy was amended in 2007 and 2008. Hereinafter, "the Policy" refers to the 2008 version. References to 2006 version of the Policy are so noted.

number of "Prohibited Substance[s]," including "'blocking' or 'masking' agents[,]" such as "diuretics or water pills, which have been used in the past by some players to reach an assigned weight." Id. § 8. The Policy addresses the consequences of a player's "[u]nknowing [a]dministration of [p]rohibited [s]ubstances." Id. § 3(E). It adopts a rule of strict liability under which "[p]layers are responsible for what is in their bodies," and explains that "a positive test result will not be excused because a player was unaware he was taking a Prohibited Substance." Id. Section eight of the Policy, entitled "Masking Agents and Supplements," states that "a positive test result will not be excused because it results from the use of a dietary supplement, rather than from intentional use of a Prohibited Substance." Id. § 8.

"Players with a confirmed positive test result will be subject to discipline by the Commissioner as outlined in the Policy . . . ." Id. § 6. "The first time a player violates this Policy by testing positive [for a banned substance] . . . he will be suspended without pay for a minimum of four regular and/or postseason games." Id. Players subject to disciplinary action may appeal to an arbitrator, who is "either the Commissioner or his designee," and whose decision "constitute[s] a full, final, and complete disposition of the appeal" that is "binding on all parties." Id. § 10.

Appendix F to the Policy, a joint letter from the Union and the NFL entitled "Use of Supplements," warns that, because dietary "supplements are not regulated . . . by the government," there is "no way to be sure" that supplements "contain the ingredients listed on the packaging[.]" Id. App. F. The letter "strongly encourage[s] [players] to avoid the use of supplements altogether," and warns that, "if you take these products, you do so AT YOUR OWN RISK!" Id. The letter advises that "several players have been suspended even though their positive test result may have been due to the use of a supplement" and that "**if you test positive or otherwise violate the Policy, you *will* be suspended**" because "[y]ou and you alone are responsible for what goes into your body." Id. Appendix G to the Policy, entitled "Supplements," is a memorandum from Dr. Lombardo which states, "If you take

supplements that contain a substance that violates the [P]olicy it will subject you to discipline[,]" and, "[m]ore importantly, you run the risk of harmful health effects associated with their use." Id. App. G.

Players may contact the "NFL Dietary Supplement Hotline" to obtain "confidential and accurate information about these products, including their ingredients, effects[,] and adverse reactions." (No. 09-2249, Defs.-Appellees' Supp. App. 5.) The memorandum announcing the hotline provides: "Although we strongly discourage the use of supplements for many reasons, we understand that an informed decision is the best one." (Id.) The memorandum goes on to caution players, stating, "*You and you alone are still responsible for what goes into your body*. Using the Hotline will not excuse a positive test result." (Id.)

In 2006, several NFL players tested positive for bumetanide,[3] a prescription diuretic and masking agent that is banned under the Policy. Policy App. A(II)(A). When Dr. Lombardo was alerted to a possible connection between the positive results for bumetanide and StarCaps, a dietary supplement, he informed Dr. Finkle. The StarCaps label does not disclose bumetanide as an ingredient. Dr. Finkle asked Dennis Crouch, Director of the Sports Medicine Research Testing Laboratory, to analyze StarCaps. On November 14, 2006, Crouch emailed Dr. Finkle and Dr. Lombardo, informing them that StarCaps contained bumetanide. Birch was also made aware of this.

On December 19, 2006, the NFLMC sent a memorandum to the presidents, general managers, and head athletic trainers of all NFL teams entitled "Dietary

---

[3]Bumetanide is a "loop diuretic used in treatment of edema associated with congestive heart failure or hepatic or renal disease, treatment of hypertension, usually in combination with other drugs, and as an adjunct in treatment of acute pulmonary edema" that is "administered orally, intramuscularly, or intravenously." Dorland's Illustrated Medical Dictionary 263 (31st ed. 2007).

Supplement Endorsement Prohibition." (Id. at 6.) The memorandum provides: "Effective immediately, please be advised that **Balanced Health Products**, which distributes **StarCaps**, has been added to the list of companies with which player endorsements or other business relationships are prohibited." (Id.) The memorandum does not state StarCaps was banned under the Policy, that StarCaps contained bumetanide, or that StarCaps contained any banned substance. (See id.)

On December 20, 2006, Stacy Robinson, the Union's Director of Player Development, sent a memorandum to all NFL agents. (Id. at 7.) The memorandum states: "Please be advised that effective immediately **Balanced Health Products**, which distributes **StarCaps**, has been added to the list of prohibited dietary supplement companies. Players are prohibited from participating in any endorsement agreements with this company or using any of their products." (Id.)

Dr. Lombardo did not refer any player who tested positive for bumetanide in 2006 for discipline. Sometime in late 2006 or 2007, Birch communicated with Dr. Lombardo about Dr. Lombardo's duties under the Policy. Birch informed Dr. Lombardo that if a player tested positive for a banned substance then, assuming the player had no therapeutic reason to be taking the banned substance, the player must be referred to the NFL for discipline.

In July and August 2008, players in the NFL submitted to random testing for steroids and other substances in accordance with the Policy. In total, five players—Kevin Williams and Pat Williams of the Minnesota Vikings, and Charles Grant, Deuce McAllister, and Will Smith of the New Orleans Saints—tested positive for bumetanide. In late September and early October 2008, all of the players were advised by letter that their positive results were a violation of the Policy and that a suspension without pay of four games was being imposed for the violations. Pursuant to the Policy, all five players appealed their suspensions, and their appeals were consolidated.

Beginning on October 23, 2008, Jeffrey Pash, Vice President and General Counsel of the NFL, met with representatives of the Vikings three times "in the context of what [he] understood to be . . . threats of litigation" arising out of the suspensions and providing legal advice. (Id. at 234.) Although "at the very first" Pash did not know that Pat Williams and Kevin Williams were involved, he learned of this via letters from Peter R. Ginsberg, the Players' counsel. (Id.) On October 30, 2008, Ginsberg contacted Pash and Birch via letter. In the letter, Ginsberg acknowledges that "several veteran NFL players recently have tested positive for a banned diuretic during random League-sponsored drug testing." (Id. at 23.) Ginsberg states that "we believe [the current NFL testing procedure] is unfair and violative of the players' fundamental and guaranteed rights . . . ." (Id.) Ginsberg notes that three of his clients have "clinical weight problems," two of whom have had to add "weight clauses into their contracts." (Id. at 23-24.) He also identifies "this [a]s a further complicating factor since a person who has a weight condition falls within a protected class" under the Americans with Disabilities Act.[4] (Id. at 24 n.1.) Ginsberg suggests that the NFL should employ a new drug test procedure, including the addition of an alternative test.[5] (Id. at 24-25.) Ginsberg concludes by stating, "We appreciate your

_____

[4] 42 U.S.C. § 12101 *et seq.*

[5] Ginsberg states:

> The current test should be used in the first instance. If there is a positive test for a banned diuretic, the alternative test, we submit, should then be used. If it yields a positive test, of any amount, for steroids, then the player should be punished according to the current guidelines. On the other hand, if the test does not yield a reading of even a trace of a banned steroid, the player then should be given a fair warning letter that a second detection of a banned diuretic would result in punishment as currently set forth in the Policy.

(No. 09-2249, Defs.-Appellees' Supp. App. 25.) The alternative test "uses a larger sample of a player's specimen and, unlike the test currently used by the NFL, is significantly more reliable in determining whether banned steroids are in a person's

consideration of this correspondence and hope that appropriate parties can arrange to meet with the Commissioner and you in advance of a hearing regarding the proposed punishment of the players involved." (Id. at 26.)

Pash had several discussions with Ginsberg, including a telephone conversation on November 3, 2008, and at least one meeting. (Id. at 235, 238.) On November 7, 2008, Ginsberg again contacted Pash via letter. (Id. at 28-30.) The letter: (1) answers Pash's request for information with regard to the Dilute Sample Reflex Test, (2) requests the NFL administrative record regarding Ginsberg's clients, (3) notes Ginsberg's "concern[] that the laboratory used by the NFL may not have all the documents we need in order to perform a complete evaluation of the tests" which will be necessary "if a hearing ultimately is necessary [and] that any further delay in receiving the administrative record will require us to seek to adjourn the hearing," and (4) includes an article which Ginsberg characterizes as demonstrating "that the sports world seems to be in the process of reevaluating the breadth of banned substances considered to be 'masking agents.'" (Id. at 28.) Ginsberg concludes by requesting that "[i]f there is any medical indication that the substance allegedly involved with my clients, in the amounts detected, presents any objective medical concern, we hope that the NFL will provide such information in advance of the hearing." (Id. at 29.)

Between November 10 and 13, 2008, Roger Goodell, the Commissioner of the NFL ("the Commissioner"), designated Pash as the Hearing Officer for the five players' appeals of their suspensions. (Id. at 239.) Also, in that same time period, Pash learned that StarCaps contained bumetanide. (Id. at 237.) The arbitration hearing took place on November 20, 2008. Each player testified that he was taking StarCaps around the time of his positive bumetanide test and that he did not know that StarCaps contained bumetanide. The players admitted that they were aware of the warnings regarding supplements, the supplement hotline, and the Policy's rule that

_____

system, and thus provides a far more accurate gauge of the reason why the detected diuretic has been used." (Id. at 24.)

-8-

each player is responsible for what is in his body. However, the players argued that their positive results should be excused because Dr. Lombardo and the NFL knew, as of November 2006, that at least some StarCaps capsules contained bumetanide—an undisclosed banned substance—and did not specifically advise NFL players of this fact. After the hearing but before issuing his decisions, Pash communicated with the Commissioner regarding "the threat of litigation that [Pash] thought hung over these proceedings." (Id. at 239.)

In decisions dated December 2, 2008, Pash determined that the language of the Policy required that the suspensions of all five players be upheld. As arbitrator, he observed:

> Notwithstanding the rule of strict liability, each player contends that his violation should be excused because the NFL and Dr. Lombardo were aware that StarCaps contained an undisclosed banned substance, bumetanide, but did not specifically advise NFL players of this fact. The players do not contend that the NFL, [the Union,] or Dr. Lombardo is obligated to test supplements for banned substances and inform players of the result of those tests. But where, as here, the testing process leads to specific information about a specific product, the players argue that the league and Dr. Lombardo have a duty to inform NFL players of the specific threat of the specific product . . . . [T]hey contend that where specific evidence is available about a particular product, a specific warning is required, and that the failure to extend such a warning should excuse any violation of the Policy associated with that product.

(Id. at 164.) Pash rejected the players' argument in light of: (1) the rule of strict liability embodied in the Policy, (2) the 20-year history of the application of the Policy, (3) the "repeated[] warn[ings] that if [players] take supplements, they do so at their own risk," (4) the "repeated warnings about the risks inherent in using supplements in general and weight loss products in particular," and (5) the fact that the players took StarCaps "knowing that a positive test would result in suspension and would not be excused based on a claim of unintentional or inadvertent use." (Id. at

165.)  Pash further noted that "[t]he Policy does not articulate or impose an obligation to issue specific warnings about specific products, and nothing in the record suggests that the bargaining parties have ever contemplated imposing such a requirement on Dr. Lombardo."  (Id.)

On December 3, 2008, the Players filed suit against the NFL, Dr. Lombardo, Dr. Finkle, and Birch in Minnesota District Court for the Fourth District,[6] alleging numerous violations of Minnesota common law.[7]  That same day, the state court issued a temporary restraining order ("TRO") blocking the suspensions.  Following entry of the TRO, the NFL removed the case to federal district court.

On December 4, 2008, the Union, on behalf of all five players, initiated a separate suit in federal court against the NFL and NFLMC, alleging breach of contract under section 301.  The Union sought to have the arbitration awards upholding the suspensions vacated as contrary to the essence of the CBA/Policy, as a violation of public policy, and as being rendered by a biased arbitrator.  On January 2, 2009, the Players filed an amended complaint in federal court, adding two counts.  Count XII asserted a violation of Minnesota's Drug and Alcohol Testing in the Workplace Act (DATWA),  Minn. Stat. §§ 181.950-957, and Count XIII asserted a violation of Minnesota's Consumable Products Act (CPA), Minn. Stat. § 181.938.

---

[6]We note that both of the Players' contracts with the Vikings, in effect at the time of their positive test results, state that Minnesota law governs the contracts.

[7]The Players' Complaint contains 11 counts: Count I seeks injunctive relief; Count II alleges a breach of fiduciary duty by the NFL; Count III contends that the NFL aided and abetted breaches of fiduciary duty; Count IV raises a violation of public policy; Counts V and VI are claims of fraud and constructive fraud; Counts VII, VIII, and IX raise negligent misrepresentation, negligence, and gross negligence claims; Count X alleges intentional infliction of emotional distress; and Count XI contends that the NFL is vicariously liable for the torts committed by the individual defendants.

On December 5, 2008, the district court granted the Union's motion for a preliminary injunction and declined to overturn the TRO entered in state court prior to removal, which allowed the players to continue playing until the end of the NFL's 2008-09 season. Following expedited discovery, the parties filed cross-motions for summary judgment. The district court granted the NFL's motion for summary judgment in part and denied it in part. The court denied the Union and the Players' motion for summary judgment. First, the district court concluded that the Players' common law claims were preempted by section 301 such that they must be construed as section 301 claims. Second, the court determined that the arbitration awards did not fail to draw their essence from the CBA/Policy because the arbitrator's decision construed and applied the language of the Policy. Also the arbitrator acted within the scope of his discretion under the Policy. Third, the court concluded that the Union's argument—that the NFL and Dr. Lombardo violated public policy by failing to disclose that StarCaps contained bumetanide—failed because Dr. Lombardo warned players about weight-loss supplements in general and testified that had a player asked him about StarCaps he would have disclosed that it contained bumetanide. The court determined that Dr. Lombardo's decision not to provide an ingredient-specific warning was within his discretion. The court further decided that the NFL had no duty to specifically inform players when a supplement is found to contain a banned substance. Finally, the court determined that Pash was not a partial arbitrator and, even if Pash's involvement could somehow establish bias, the Players and the Union had waived any such claim. Therefore, the court dismissed the Union's section 301 breach of contract claim and the Players' common law claims (which the court had already determined were actually § 301 claims).

With respect to the Players' DATWA and CPA claims, the court found that the claims were not preempted because the rights and obligations under the statutes existed independently of the CBA/Policy. Having dismissed all of the federal claims, the district court declined to exercise supplemental jurisdiction over the DATWA and CPA claims, concluding that the statutes are a reflection of Minnesota public policy

and, thus, it was more appropriate for a Minnesota state court to resolve the claims. The NFL, the Players, and the Union each appeal portions of the district court's summary judgment order.

## II.

The NFL appeals the district court's partial denial of its motion for summary judgment. Specifically, the NFL appeals the district court's decision that the Players' Minnesota statutory claims are not preempted by section 301. Conversely, the Players appeal the district court's determination that their Minnesota common law claims are preempted by section 301. We review the preemption issues de novo. Bogan v. Gen. Motors Corp., 500 F.3d 828, 832 (8th Cir. 2007).

## A.

We first consider the DATWA claim. The NFL asserts that the DATWA claim is preempted because: (1) the claim turns on analysis of the Policy in order to determine whether it "meets or exceeds" DATWA's requirements, (2) the claim requires interpretation of the Policy in order to determine whether the NFL qualifies as an employer under DATWA such that the statute's protections extend to the Players, and (3) uniform interpretation of the CBA/Policy is necessary to preserve the integrity of the NFL's business as a national organization.

We begin our analysis by reviewing the section 301 preemption doctrine. Section 301 applies to "[s]uits for violation of contracts between an employer and a labor organization," 29 U.S.C. § 185(a), or, in other words, suits for breaches of CBAs. The Supreme Court has held that federal law exclusively governs suits for breach of a CBA, see Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 456 (1957), and that "the pre-emptive force of [section] 301 extends beyond state-law contract actions[,]" United Steelworkers v. Rawson, 495 U.S. 362, 369 (1990); see

-12-

Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 210 (1985). Section 301 preempts state-law claims that are "substantially dependent upon analysis" of a CBA, Lueck, 471 U.S. at 220, because "the application of state law . . . might lead to inconsistent results since there could be as many state-law principles as there are States . . . [,]" Lingle v. Norge Div. of Magic Chef, Inc., 486 U.S. 399, 406 (1988). Rather, "federal labor-law principles—necessarily uniform throughout the nation—must be employed to resolve the dispute." Id. However, the Court has established that section 301 does not preempt state law claims merely because the parties involved are subject to a CBA and the events underlying the claim occurred on the job. See Lueck, 471 U.S. at 211 ("Of course, not every dispute concerning employment, or tangentially involving a provision of a collective-bargaining agreement, is pre-empted by § 301 . . . ."); see also Graham v. Contract Transp., Inc., 220 F.3d 910, 913 (8th Cir. 2000) (providing that "a claim is not preempted simply because it relates to a dispute in the workplace").

In applying the section 301 preemption doctrine, we begin with "the claim itself," see Trustees of the Twin City Bricklayers Fringe Benefit Funds v. Superior Waterproofing, Inc., 450 F.3d 324, 331 (8th Cir. 2006), and apply a two-step approach in order to determine if the claim is sufficiently "independent" to survive section 301 preemption, see Bogan, 500 F.3d at 832. First, a "state-law claim is preempted if it is 'based on' [a] . . . provision of the CBA[,]" meaning that "[t]he CBA provision at issue" actually sets forth the right upon which the claim is based. Id. Second, section 301 preemption applies where a state-law claim "is 'dependent upon an analysis' of the relevant CBA," meaning that the plaintiff's state-law claim requires interpretation of a provision of the CBA. Id.

DATWA governs drug and alcohol testing in the Minnesota workplace by imposing "minimum standards and requirements for employee protection" with regard to an employer's drug and alcohol testing policy. Minn. Stat. § 181.955 subdiv. 1.

DATWA lists minimum informational requirements for the contents of drug policies.[8] Id. § 181.952 subdiv. 1. DATWA sets forth the criteria that a testing laboratory must meet in order for an employer to use its services. Id. § 181.953 subdiv. 1.

DATWA also requires that an employer provide an employee, who tests positive for drug use, with "written notice of the right to explain the positive test[,]" Id. § 181.953 subdiv. 6(b), an opportunity "to explain that result," Id. § 181.953 subdiv. 6(c), and the ability to "request a confirmatory retest of the original sample at the employee's or job applicant's own expense . . . [,]" id. DATWA precludes an employer from "discharg[ing] [or] disciplin[ing] . . . an employee on the basis of a positive result . . . that has not been verified by a confirmatory test." Id. § 181.953 subdiv. 10(a). Specifically, with respect to first-time offenders, an employer cannot discharge such an employee unless the employee is first given the opportunity to participate in treatment and refuses to participate or fails to successfully complete the program. Id. § 181.953 subdiv. 10(b)(1)-(2).

DATWA expressly addresses CBAs. Subdivision two of section 181.955 mandates that DATWA applies to all CBAs in effect after passage of the law in 1987. See id. § 181.955 subdiv. 2. However, subdivision one of section 181.955 provides

---

[8]Pursuant to DATWA, the drug policies of Minnesota employers must provide:

(1) the employees or job applicants subject to testing under the policy; (2) the circumstances under which drug or alcohol testing may be requested or required; (3) the right of an employee or job applicant to refuse to undergo drug and alcohol testing and the consequences of refusal; (4) any disciplinary or other adverse personnel action that may be taken based on a confirmatory test verifying a positive test result on an initial screening test; (5) the right of an employee or job applicant to explain a positive test result on a confirmatory test or request and pay for a confirmatory retest; and (6) any other appeal procedures available.

Minn. Stat. § 181.952 subdiv. 1(1)-(6).

that DATWA "shall not be construed to limit the parties to a collective bargaining agreement from bargaining and agreeing with respect to a drug and alcohol testing policy that meets or exceeds, and does not otherwise conflict with, the minimum standards and requirements for employee protection . . . ." Id. § 181.955 subdiv. 1.

We note that it is unclear which specific violations of DATWA that the Players are alleging, other than the failure to use certified laboratories.[9] The amended complaint does not flesh out the claim but generally states that the "[d]efendants have violated the Players' substantive and procedural rights under the Minnesota Drug and Alcohol Testing in the Workplace Act." (Am. Compl. ¶ 98.) The district court, in discussing the DATWA claim, noted that "[a]mong other things, DATWA provides that an employee may not be disciplined on the basis of an initial positive test and requires the employer to allow the employee the right to explain a positive test[,]" and that "[t]he NFL concedes that its steroid testing procedures do not comply with the letter of Minnesota law, but argues that the differences are negligible and do not require the Court to invalidate the Williamses' positive tests for bumetanide." (Dist. Ct. Summ. J. Order 20.)

First, the NFL contends that, because the Players were tested pursuant to a collectively bargained-for drug policy, DATWA liability hinges on whether the Policy affords protections that are equivalent to or greater than DATWA's mandatory protections. The NFL asserts that DATWA creates two paths to compliance such that an employer may conduct its drug testing either: (1) in compliance with DATWA or (2) pursuant to a CBA providing employees with equivalent or greater protections than DATWA. The NFL argues that this will necessarily require a court to construe the terms of the Policy in order to determine whether its protections for players "meets or exceeds" DATWA's protections such that any DATWA claim alleged by the Players is preempted by section 301. See Minn. Stat. § 181.055 subdiv. 1. Thus, the

---

[9]At oral argument, the Players' counsel indicated that their DATWA claim was premised, at least in part, on the NFL's conceded failure to use certified laboratories.

NFL is essentially arguing that an employee has no DATWA claim if he or she is a party to a CBA that is at least as protective of the employee as DATWA. We disagree.

DATWA does not state that an employee who is a party to such a CBA cannot bring a claim under DATWA. Rather, where there is a CBA that is at least as protective of employees as DATWA, the number of possible claims an employee has against his or her employer will be affected. Where the employer complies with DATWA but not with its CBA that provides greater protection, the employee could have a only a claim for breach of contract. Where the employer does not comply either with DATWA or its CBA that provides equivalent or greater protection than DATWA, the employee could potentially have two claims, a claim for breach of contract and a DATWA claim.

Here, a court would have no need to consult the Policy in order to resolve the Players' DATWA claim. Rather, it would compare the facts and the procedure that the NFL actually followed with respect to its drug testing of the Players with DATWA's requirements for determining if the Players are entitled to prevail. Such a claim is not preempted. See Hawaiian Airlines, Inc. v. Norris, 512 U.S. 246, 261, 266 (1994) ("'[P]urely factual questions' about an . . . employer's conduct . . . do not 'requir[e] a court to interpret any term of a [CBA].'" (quoting Lingle, 486 U.S. at 407)); see also Thompson v. Hibbing Taconite Holding Co., No. 08-868, 2008 WL 4737442, *1, *4 (D. Minn. Oct. 24, 2008) (unpublished) (holding that a terminated employee's multiple DATWA claims alleged "violat[ions] [of] such non-negotiable state law rights [which] d[id] not require an interpretation of the CBA, and would not be preempted under the LMRA"). The Tenth Circuit considered an analogous fact situation in Karnes v. Boeing Co., 335 F.3d 1189 (10th Cir. 2003). There, a former employee brought an action against Boeing under Oklahoma's Standards for Workplace Drug and Alcohol Testing Act. Id. at 1192. Although the plaintiff did not identify the specific sections of the Act that Boeing violated, the court observed that

"within the sections he cite[d]" was a provision providing that "[n]o disciplinary action, except for a temporary suspension or a temporary transfer to another position, may be taken by an employer against an employee based on a positive test result unless the test result has been confirmed by a second test." Id. at 193 (quotation omitted). The court observed that "[i]n order to establish a violation of this section, [the plaintiff] must show that Boeing (1) discharged him based on his drug test, and (2) failed to confirm the result through a second test. Neither inquiry requires a court to interpret, or even refer to, the terms of a CBA." Id. Therefore, the court found that the state statutory claim was "clearly independent of the CBA and . . . not subject to § 301 preemption." Id. at 1194.

Second, the NFL contends that, because DATWA provides employees with a cause of action against their employers, interpretation of the CBA/Policy is required in order to determine if the NFL qualifies as an employer under DATWA.[10] Section 301 preempts a state law claim if its "resolution . . . *depends upon the meaning* of a collective-bargaining agreement." Lingle, 486 U.S. at 405-06 (emphasis added). "[T]he Supreme Court has distinguished those which require interpretation or construction of the CBA from those which only require reference to it." Trustees, 450 F.3d at 330; see Livadas v. Bradshaw, 512 U.S. 107, 124-25 (1994) (holding there was no section 301 preemption because a wage rate provision of the CBA only had to be referenced to compute the proper damages). "An otherwise independent claim will not be preempted if the CBA need only be consulted during its adjudication." Trustees, 450 F.3d at 330. In sum, section 301 does not preempt every employment

_____

[10]DATWA defines an employer as "a person or entity located or doing business in this state and having one or more employees . . . ." Minn. Stat. § 181.950 subdiv.7. An employee is "a person, independent contractor, or person working for an independent contractor who performs services for compensation, in whatever form, for an employer." Id. § 181.950 subdiv.6. The NFL maintains that the Minnesota Vikings, not the NFL and the individual defendants, are the Players' employer such that DATWA does not apply. Although the NFL conceded that it does business within Minnesota, it did not concede that it has one or more employees there.

dispute, and it does not preempt all other disputes concerning CBA provisions. Miner v. Local 373, 513 F.3d 854, 865 (8th Cir. 2008). "Rather, the crucial inquiry is whether 'resolution of a state-law claim depends upon the meaning of a [CBA].'" Id. (quoting Lingle, 486 U.S. at 405-06).

The NFL does not point to a specific provision of either the CBA or the Policy which must be interpreted. The CBA's Preamble provides that NFL players are "employed by a member club of the National Football League[.]" CBA, Preamble. Appendix C to the CBA contains the "NFL Player Contract,"[11] which provides that the contract "is between . . . [the] 'Player,' and . . . 'Club,' . . . as a member of the National Football League." Id. App. C at 248. The contract further states: "Club employs Player as a skilled football player. Player accepts such employment." Id. None of these references require interpretation, only mere consultation, which is insufficient to warrant preemption of an otherwise independent state law claim. See Livadas, 512 U.S. at 124-25; Trustees, 450 F.3d at 330. Furthermore, the Players' contracts, likely dispositive in determining who their employer is, are actually separate documents from the CBA such that there is no need to reference the form contract contained in Appendix C of the CBA to examine them.[12]

---

[11]The CBA states that the form contract contained in Appendix C "will be used for all player signings" and "cannot be amended without the approval of the [NFLMC] and the [Union]." CBA art. XIV, § 1.

[12]We note that the matter of who is the employer of an NFL player was addressed in Brown v. Nat'l Football League, 219 F. Supp. 2d 372 (S.D.N.Y. 2002). There, a former NFL player brought a personal injury action in state court against the NFL, seeking damages for a career-ending eye injury he sustained during a game when a referee threw a penalty flag that struck the player in the eye. Id. at 375. The district court observed, "At the time of his injury, Brown worked not for the NFL, but for the Cleveland Browns Football Company, a Delaware limited partnership and an entirely separate entity which happens to be a member of the NFL." Id. at 383. The owners of NFL teams "own franchises in the NFL and employ the [U]nion members as football players." Id.; see also Clarett v. Nat'l Football League, 369 F.3d 124, 138

Finally, the NFL argues that denying preemption and subjecting the Policy to divergent state regulations would render the uniform enforcement of its drug testing policy, on which it relies as a national organization for the integrity of its business, nearly impossible. The Ninth Circuit, sitting en banc, has rejected a similar argument. See Cramer v. Consolidated Freightways, Inc., 255 F.3d 683, 695 n.9 (9th Cir. 2001) (en banc). In Cramer, the employer, a large trucking company, "argue[d] that the terms of CBAs affecting employees in multiple states should supersede inconsistent state laws." Id. at 688, 695 n.9. The Ninth Circuit observed, "This contention overreaches, however, because the LMRA certainly did not give employers and unions the power to displace any state regulatory law they found inconvenient." Id. at 695 n.9. We think this is the proper result in light of the Supreme Court's observation that:

> [T]here [is not] any suggestion that Congress, in adopting § 301, wished to give the substantive provisions of private agreements the force of federal law, ousting any inconsistent state regulation. Such a rule of law would delegate to unions and unionized employers the power to exempt themselves from whatever state labor standards they disfavored. *Clearly, § 301 does not grant the parties to a [CBA] the ability to contract for what is illegal under state law.* In extending the pre-emptive effect of § 301 beyond suits for breach of contract, it would be inconsistent with

---

(2d Cir. 2004) ("Because the NFL players have unionized and have selected the NFLPA as its exclusive bargaining representative, labor law prohibits Clarett from negotiating directly the terms and conditions of his employment with any NFL club[.]"); White v. Nat'l Football League, 41 F.3d 402, 406 (8th Cir. 1994), abrogated on other grounds by Amchem Prods. v. Windsor, 521 U.S. 591 (1997) ("The settlement agreement [at issue] purports to end a six-year dispute between the NFL member teams and their player-employees."); Chuy v. Philadelphia Eagles Football Club, 595 F.2d 1265, 1269 (3d Cir. 1979) ("This appeal presents several interesting questions growing out of the employment by the Philadelphia Eagles Football Club ('the Eagles') of a former professional player, Don Chuy ('Chuy').")). We do not address the impact of this on the Players' ability to prevail on their DATWA claim against the NFL.

-19-

congressional intent under that section to preempt state rules that proscribe conduct, or establish rights and obligations, independent of a labor contract.

Lueck, 471 U.S. at 211-12 (footnote omitted) (emphasis added); see Livadas, 512 U.S. at 123 (cautioning that section 301 "cannot be read broadly to pre-empt nonnegotiable rights conferred on individual employees as a matter of state law"); see also Karnes, 335 F.3d at 1194 (noting that "the fact that the CBA incorporated Boeing's anti-drug policy is irrelevant because '§ 301 does not grant the parties to a [CBA] the ability to contract for what is illegal under state law'" (quoting Lueck, 471 U.S. at 212)). Therefore, the NFL's national uniformity argument fails.

In sum, the Players' DATWA claim is predicated on Minnesota law, not the CBA or the Policy, and the claim is not dependent upon an interpretation of the CBA or the Policy. Thus, the Players' DATWA claim is not preempted by section 301.

B.

We now turn to the CPA claim. The CPA generally prohibits employers from "disciplin[ing] or discharg[ing] an employee because the . . . employee engages in or has engaged in the use or enjoyment of lawful consumable products, if the use or enjoyment takes place off the premises of the employer during nonworking hours." Minn. Stat. § 181.938 subdiv. 2. "'[L]awful consumable products' means products whose use or enjoyment is lawful and which are consumed during use or enjoyment, and includes food, alcoholic or nonalcoholic beverages, and tobacco." Id. However, employers can restrict employee consumption of "lawful consumable products" if they "relate[] to a bona fide occupational requirement and [are] reasonably related to employment activities or responsibilities of a particular employee or group of employees," id. § 181.938 subdiv. 3(a)(1), or are "necessary to avoid a conflict of interest or the appearance of a conflict of interest with any responsibilities owed by the employee to the employer[,]" id. § 181.938 subdiv. 3(a)(2).

-20-

The NFL asserts that the CPA claim is subject to section 301 preemption because: (1) whether the Policy's ban on bumetanide violates the CPA requires interpretation of the Policy in order to determine whether the ban is a bona fide occupational requirement or necessary to avoid a conflict of interest, (2) the CPA only applies to the use of substances "off the premises of the employer" and "during nonworking hours" such that a court would have to analyze the CBA and the Policy in order to determine whether the CPA applies here, and (3) the Players waived their rights under the CPA when the Union, their bargaining agent, became a party to the Policy.

First, the NFL contends that the Players' CPA claim is preempted by section 301 because, without interpreting the CBA and the Policy, a court cannot determine whether the ban on bumetanide is a bona fide occupational requirement, or necessary to avoid a conflict of interest such that the ban does not violate the CPA. However, the NFL's defenses to liability under the CPA are not relevant to our section 301 analysis.[13]  See Bogan, 500 F.3d at 833; see also Meyer v. Schnucks Markets,

---

[13]This court has previously addressed the conflict in our precedent with regard to the section 301 preemption with some of our cases failing to apply section 301 preemption "in an appropriately narrow way." See Meyer v. Schnucks Markets, Inc., 163 F.3d 1048, 1050 (8th Cir. 1998).  The Meyer Court stated:

> When faced with conflicting precedents of this kind, we are free to choose which line of cases to follow.  We think that the narrower approach to LMRA preemption, which asks only whether the claim itself is necessarily grounded in rights established by a CBA, is more faithful to the Supreme Court's [precedent] . . . .

Id. at 1051 (citation omitted).  Specifically, with respect to defenses to liability as a basis for section 301 preemption, our precedent is conflicted.  See Bogan, 500 F.3d at 833.  For example, in Johnson v. Anheuser Busch, Inc., 876 F.2d 620 (8th Cir. 1989), this court stated that an employer's "defenses, as well as [the employee's] claims, must be considered in determining whether resolution of the state law claim requires construing the [CBA]."  Id. at 623 (quotation omitted).  However, the Bogan

-21-

<u>Inc.</u>, 163 F.3d 1048, 1051 (8th Cir. 1998). Therefore, neither of the NFL's potential defenses to the Players' CPA claim, i.e. the bona-fide-requirement exception, <u>see</u> Minn. Stat § 181.938 subdiv. 3(a)(1), or the conflict-of-interest exception, <u>see</u> <u>id.</u> § 181.938 subdiv. 3(a)(2), can serve as a basis for subjecting the CPA claim to section 301 preemption.

Second, the NFL asserts that the CPA claim is subject to preemption because the CPA applies to the use of substances "off the premises of the employer" and

---

Court noted, "[W]e have on other occasions rejected this broader approach to LMRA preemption, that is, an approach where the employer's defenses are relevant." 500 F.3d at 833. The <u>Bogan</u> Court applied the narrower approach in which an employer's defenses to liability are irrelevant to the question of section 301 preemption as "more faithful to [Supreme Court precedent]" and reversed the district court's determination that the plaintiff's intentional infliction of emotional distress claim was preempted." <u>Id.</u> (quotation omitted); <u>see</u> <u>Dunn v. Astaris, LLC</u>, 292 F. App'x 525, 527 (unpublished per curiam) (8th Cir. 2007). <u>Dunn</u> explained,

> Some of our cases have applied [Supreme Court precedent with regard to section 301 preemption] in a rather broad way. Nevertheless, we find the line of cases that has taken a narrower approach to LMRA preemption—asking only whether the claim itself, *regardless of probable defenses*, is necessarily grounded in rights established by the CBA—is the better approach.

<u>Id.</u> (citation omitted) (emphasis added).

We agree with <u>Bogan</u> and <u>Meyer</u> that the narrower approach to section 301 is more faithful to Supreme Court precedent and consider only the Players' CPA claim itself, and not the NFL's defenses to liability, in determining whether the claim is preempted. <u>See</u> <u>Bogan</u>, 500 F.3d at 833; <u>Meyer</u>, 163 F.3d at 1051; <u>see also</u> <u>Caterpillar Inc. v. Williams</u>, 482 U.S. 386, 398-99 (1987) (holding that a defendant cannot subject a state law claim to federal preemption by raising a defense that requires analysis of a CBA); <u>Cramer</u>, 255 F.3d at 691 (holding that "[i]f the claim is plainly based on state law, § 301 preemption is not mandated simply because the defendant refers to the CBA in mounting a defense") (<u>citing</u> <u>Caterpillar</u>, 482 U.S. at 398-99)).

"during nonworking hours," Minn. Stat. § 181.938 subdiv. 2, such that a court could not resolve whether the CPA applies here without interpreting the CBA and the Policy. We note that once again the NFL has failed to direct us to a specific provision of the CBA or the Policy that must be construed. The NFL asserts that the relevant time period is training camp since that is when the Players tested positive for bumetanide and suggests that, during that time, NFL players are never "off the premises of the employer" and have no "nonworking hours." (Nos. 09-2247/2492, Defs.-Appellants' Br. 30.)

Without any direction from the NFL, we have reviewed the 361-page document, provision-by-provision, for references to "training camp." Article XXXVII of the CBA is entitled "PRE-SEASON TRAINING CAMPS" and has eight sections: Definition, Room and Board, Rookie Per Diem, Veteran Per Diem, Reporting, Number of Pre-Season Games, Telephones, and Expenses. CBA, art. XXXVII. However, we see nothing in this section relevant to the terms "off the premises of the employer" or "nonworking hours." We have also looked to the CBA's other mentions of training camp but again found nothing relevant to the question of what constitutes "off the premises of the employer" and "during nonworking hours" while an NFL player is attending training camp. Furthermore, we find no mention of training camp in the Policy. We are unaware of exactly what document would resolve this issue; perhaps a team's schedule for training camp? But this is not our riddle to solve, as it is the NFL's burden to establish preemption of the Players' CPA claim. See Barnes ex rel. Estate of Barnes v. Koppers, Inc., 534 F.3d 357, 362 (5th Cir. 2008) ("[T]he party asserting federal preemption of state law . . . bears the burden of persuasion."). Thus, we reject the NFL's argument that preemption is necessary because resolving the meaning of the terms "off the premises of the employer" or "nonworking hours" while an NFL player is at training camp requires interpretation of the CBA and the Policy.

The NFL's final argument for preemption is that the Players have waived their rights under the CPA because their bargaining representative, the Union, agreed to the drug testing procedures and discipline provided for by the Policy. However, neither of the cases that the NFL relies on, Lueck and A.J. Lights, LLC v. Synergy Design Group, Inc., 690 N.W.2d 567 (Minn. Ct. App. 2005), supports such a proposition. First, the NFL quotes Lueck in part to state that "in the absence of any affirmative legislative direction, the presumption is that the [CPA's] rights 'can be waived or altered by agreement of private parties[.]'" (Nos. 09-2247/2492, Defs.-Appellants' Br. 31 (quoting Lueck, 471 U.S. at 213)) However, the entire quote from Lueck states something completely different: "[S]tate-law rights and obligations *that do not exist independently* of private agreements, and that as a result can be waived or altered by agreement of private parties, are preempted by those agreements." Lueck, 471 U.S. at 213 (emphasis added). Because the CPA undisputedly creates rights independent of the CBA or the Policy, they cannot be waived or altered by the Union's agreement to the CBA and the Policy. Second, A.J. Lights examined whether "the [Minnesota Termination of Sales Representatives Act] supercede[s] a contractual arbitration agreement by allowing a sales representative to file a claim in a court of law prior to arbitration." 690 N.W.2d at 568. Therefore, A.J. Lights is wholly inapplicable here and the NFL has not demonstrated that, by agreeing to be bound by the CBA, the Players waived their rights under the CPA. Because each of the NFL's arguments for subjecting the Players' CPA claim to section 301 preemption fails, we hold that the CPA claim is not preempted.

## C.

Finally, we consider the Players' common law claims: breach of fiduciary duty, aiding and abetting a breach of fiduciary duty, violations of public policy, fraud, constructive fraud, negligent misrepresentation, negligence, gross negligence, intentional infliction of emotional distress, and vicarious liability. The Players argue that the claims are not preempted because they involve purely factual questions about

the NFL's conduct and do not require interpretation of any provision of the CBA or the Policy. Again, we consider issues of preemption de novo. Bogan, 500 F.3d at 832.

As with the Players' state statutory claims, "a state-law tort action against an employer may be pre-empted by [section] 301 . . . ." Rawson, 495 U.S. at 369 (citing Lueck, 471 U.S. at 211). We apply the same test here to determine whether such claims are preempted, examining whether the tort claims: (1) are premised on duties created by the relevant CBA such that they are "based on" the agreement, or (2) require interpretation of the CBA such that they are "dependent upon an analysis" of the agreement. See Bogan, 500 F.3d at 832.

According to the Players, their breach of fiduciary duty, negligence, and gross negligence claims are each "premised on the fact that the NFL had a common duty to the Williamses once it sought and found out the dangerous fact that StarCaps contained Bumetanide." (Nos. 09-2247/2462, Pls.-Appellees-Cross-Appellants' Br. 58) Thus, each tort claim is seeking recovery for the NFL's and the individual defendants' failure to disclose to the Players that StarCaps contained bumetanide, despite the defendants' undisputed awareness of that fact. The Players assert that this duty to provide an ingredient-specific warning for StarCaps does not arise from the Policy but from a duty that Minnesota law imposes on the NFL as a fiduciary, an employer, and as one who voluntarily undertook to act or speak. However, whether the NFL or the individual defendants owed the Players a duty to provide such a warning cannot be determined without examining the parties' legal relationship and expectations as established by the CBA and the Policy. Thus, the breach of fiduciary duty, negligence, and gross negligence claims are "inextricably intertwined with consideration of the terms of the [Policy]." See Bogan, 500 F.3d at 833 (quoting Lueck, 471 U.S. at 220). Because the claims "relating to what the parties to a labor agreement agreed . . . must be resolved by reference to uniform federal law," Lueck, 471 U.S. at 211, they are preempted by section 301.

The Players' misrepresentation claims (fraud, constructive fraud, and negligent misrepresentation)[14] are also preempted because the Players cannot demonstrate the requisite reasonable reliance to prevail on their claims without resorting to the CBA and the Policy. In Trustees, a Minnesota corporation brought a third-party complaint against a union, of which a number of the corporation's employees were members, claiming fraudulent and negligent misrepresentation, and fraudulent concealment. 450 F.3d at 326, 328. This court concluded that the plaintiff had not adequately pled fraudulent concealment under Minnesota law. Id. at 331. With respect to fraudulent and negligent misrepresentation, this court observed:

> Under Minnesota law both require proof that the plaintiff justifiably relied on the defendant's misleading statements. Whether a plaintiff's reliance was justifiable is determined in light of the specific information and experience it had. One can only justifiably rely on a statement which conflicts with the provisions of a written agreement it has signed if the agreement is couched in ambiguous legal language which a layman could reasonably believe supported the representation.

Id. at 331 (quotation omitted). The court concluded,

> To determine whether Superior justifiably relied on the oral assurances allegedly made by the Union, the trier of fact would have to determine whether the contractual language in the CBA was ambiguous enough for a layman reasonably to believe that it was not contrary to the representations on which Superior claims it relied. This would require the trier of fact to examine the provisions in [the CBA] . . . . Since

---

[14]Each of these claims require the Players to show they reasonably relied on the lack of an ingredient-specific warning with regard to StarCaps to establish that StarCaps did not contain a banned substance. See Smith v. Brutger Cos., 569 N.W.2d 408, 413 (Minn. 1997) (negligent misrepresentation); Perl v. St. Paul Fire & Marine Ins. Co., 345 N.W.2d 209, 213 (Minn. 1984) (constructive fraud); Midland Nat'l Bank of Minneapolis v. Perranoski, 299 N.W.2d 404, 411 (Minn. 1980) (fraudulent misrepresentation).

Superior has the burden under Minnesota law to establish justifiable reliance, it would have to show that all of the cited provisions [of the CBA] could plausibly be read together to be consistent with its alleged understanding of its fringe benefit obligations. Adjudication of the dispute and resolution of the third party claims will necessarily involve interpretation of the CBA.

Id. at 332 (citations omitted). Similarly here, the question of whether the Players can show that they reasonably relied on the lack of a warning that StarCaps contained bumetanide cannot be ascertained apart from the terms of the Policy, specifically section eight, entitled "Masking Agents and Supplements" and Appendix G, entitled "Supplements." Because resolving the Players' misrepresentation claims will require interpretation of the Policy, they are preempted by section 301.

The Players' intentional infliction of emotional distress claim based on the NFL's failure to warn them that StarCaps contained bumetanide is also preempted. Under Minnesota law, "[t]o prove the intentional infliction of emotional distress, respondent must show appellant's conduct (1) was extreme and outrageous; (2) was intentional or reckless; (3) caused emotional distress; and that the emotional distress caused by appellant (4) was severe." Wenigar v. Johnson, 712 N.W.2d 190, 207 (Minn. Ct. App. 2006). However, one can only evaluate the outrageousness of the NFL's conduct, not disclosing to the Players that StarCaps contained bumetanide, in light of what the parties have agreed to in the Policy. Because the claim hinges on interpretation of the Policy, it is subject to preemption under section 301.

As to the Players' "Vicarious Liability/Respondeat Superior" claim, they allege:

[a]t all times relevant to this litigation, Defendants Lombardo, Finkle, and Birch were agents or employees of the NFL acting within the scope of their employment by, or responsibilities to, Defendant NFL and in furtherance of Defendants' business. As Defendants Lombardo, Finkle and Birch's employer or nominal employer, Defendant NFL is responsible for the individual Defendants' actions and responsibilities

-27-

within the scope of their employment and/or responsibilities. As a result of Defendants Lombardo, Finkle and Birch's torts within the scope of their employment with, or responsibilities to, Defendant NFL as alleged above . . . .

(Am. Compl. ¶ 93-94.) Here, the Players are not seeking to impose separate tort liability on the NFL. Rather, they are premising liability on the torts of its employees—the individual defendants—based on their employment with the NFL. See Urban v. Am. Legion Dep't of Minn., 723 N.W.2d 1, 8 (Minn. 2006) ("[V]icarious liability is a principle whereby responsibility is imposed on the master who is not directly at fault." (quotation omitted)). Because we have concluded that each of the underlying tort claims is preempted by section 301, we need not further address vicarious liability.

III.

The Union seeks to vacate the arbitration awards, affirming the NFL's suspension of the five players who tested positive for bumetanide, pursuant to section 301. In reviewing a district court's order confirming arbitration awards, we review conclusions of law de novo and findings of fact for clear error. Winfrey v. Simmons Foods, Inc., 495 F.3d 549, 551 (8th Cir. 2007). However, "[o]ur review is restricted by the great deference accorded arbitration awards. The award must be confirmed so long as the arbitrator is even arguably construing or applying the [agreement] even if the court thinks that his interpretation of the agreement is in error." Id. (quotations omitted).

We have noted that, "[a]lthough an arbitrator has broad authority, the arbitrator is not wholly free from judicial review. An arbitrator's award can be vacated for the reasons provided in the Federal Arbitration Act (FAA)." Schoch v. InfoUSA, Inc., 341 F.3d 785, 788 (8th Cir. 2003) (citing 9 U.S.C. § 10(a) (listing several reasons to vacate including: corruption, fraud, undue means, evident partiality, misconduct, or ultra vires acts)).

-28-

In addition to the statutory reasons for vacating arbitration awards, our court has recognized two extremely narrow judicially created standards for vacating an arbitration award. First, an arbitrator's award can be vacated if it is completely irrational, meaning it fails to draw its essence from the agreement. . . . The second judicially created standard for vacating an arbitration award is when the award evidence[s] a manifest disregard for the law.

Id. (quotations omitted).

The Union asserts three bases for vacating the arbitration awards: (1) the awards ignore the Policy provision requiring that Dr. Lombardo independently determine whether to recommend players for discipline which was violated as a result of the NFL's interference, (2) the awards violate public policy requiring both the NFL and Dr. Lombardo to disclose a specific, potentially lethal health risk otherwise unknown to NFL players, and (3) the awards were issued by a biased arbitrator in light of Pash's undisclosed legal advice to the Vikings and the NFL with regard to the Players. We address each in turn.

First, the Union argues that the awards fail to draw their essence from the Policy. Specifically, the Union asserts that the arbitrator ignored the provision in the Policy providing Dr. Lombardo with the discretion to determine whether a positive test result for a banned diuretic (like bumetanide) should be referred for discipline. The Union argues that Dr. Lombardo did not possess the requisite discretion to determine whether to refer the five players for discipline because Birch had previously instructed Dr. Lombardo to do so. "An arbitrator's award draws its essence from the [parties' agreement] as long as it is derived from the agreement, viewed in light of its language, its context, and any other indicia of the parties' intention." Schoch, 341 F.3d at 788 (quotation omitted). However, "[a]n arbitrator is not free to ignore or abandon the plain language of the parties' agreement." Gas Aggregation Servs., Inc. v. Howard Avista Energy, LLC, 319 F.3d 1060, 1065 (8th Cir. 2003); see Keebler Co. v. Milk Drivers & Dairy Employees Union, Local No. 471, 80 F.3d 284, 288 n.4 (8th Cir. 1996).

Under the 2006 Policy, Dr. Lombardo served as the "Advisor," and "ha[d] the sole discretion to make determinations regarding steroid-related matters, including medical evaluations and testing." NFL Players Association, National Football League Policy on Anabolic Steroids and Related Substances § 2 (2006). Dr. Lombardo testified that, in 2006, he did not refer any of the players who tested positive for bumetanide for discipline. (No. 09-2249, Appellant App. 209.) Sometime between December 2006 and the start of the 2007-08 NFL season, Birch directed Dr. Lombardo to forward for discipline all positive test results for diuretics. (Id. at 224-26, 256.) Dr. Lombardo complied with Birch's request. (Id. at 224-25.) The Policy was subsequently amended. Under the 2008 Policy, which was in effect at the time that the five players tested positive for bumetanide and Dr. Lombardo referred them for discipline, Dr. Lombardo's title was Independent Administrator. Policy, § 2. The Policy provides: "Neither the NFL, the [Union], nor any NFL Member Club directs the specific testing schedule, decides which players will be tested, or influences the Independent Administrator's determination whether a potential violation has occurred and should be referred for further action." Id. Dr. Lombardo testified that, absent Birch's directive prior to the 2007-08 season, Dr. Lombardo would not have referred any of the five players involved in this case for discipline as a result of their positive test results for bumetanide. (No. 09-2249, Appellant App. 233-34.)

The Union argues that Birch's directive violated both the provisions of the 2006 Policy and the 2008 Policy which vested Dr. Lombardo with the discretion to determine which positive results were referred for discipline. The Union further asserts that the arbitrator's failure to recognize these violations means that he ignored the policies in issuing the arbitration awards. However, the Union's allegations constitute a challenge to the actions of Birch and the NFL, not those of the arbitrator. The Union admits that it did not learn of Birch's directive until discovery in this case, which took place after the arbitration hearing and decision. There is no indication that the arbitrator knew of Birch's direction when he issued the awards. Thus, it is clear

that the arbitrator did not "ignore" the provisions of either the 2006 or 2008 Policies when he issued the awards. Therefore, Birch's directive is not a reason to vacate the arbitrator's award in this case.

Second, the Union argues that upholding the awards must be vacated because the awards approve of the NFL's and Dr. Lombardo's failure to warn NFL players that StarCaps, an over-the-counter supplement, contained bumetanide, a potentially seriously harmful substance, in violation of public policy. "If the [Policy] as interpreted by [the arbitrator] violates some explicit public policy, [courts] are obliged to refrain from enforcing it." W.R. Grace & Co. v. Local Union 759, Int'l Union of the United Rubber, Cork, Linoleum, & Plastic Workers, 461 U.S. 757, 766 (1983). However, "[s]uch a public policy . . . must be well defined and dominant, and is to be ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed public interests.'" Id. (quoting Muschany v. United States, 324 U.S. 49, 66 (1945)); see United Food & Commercial Workers' Union Local 655 v. St. John's Mercy Health Sys., 448 F.3d 1030, 1032 (8th Cir. 2006) ("An award should of course not be enforced if it would violate some explicit public policy."). The Supreme Court has further instructed that "the public policy exception is narrow . . . ." E. Associated Coal Corp. v. United Mine Workers, 531 U.S. 57, 63 (2000); see MidAm. Energy Co. v. Int'l Bhd. of Elec. Workers Local 499, 345 F.3d 616, 619 (8th Cir. 2003).

The Union argues that the awards violated the public policy of governing New York law which imposes a duty on the NFL as a fiduciary in connection with the Policy and as an employer to disclose the presence of bumetanide, a prescription diuretic, in StarCaps.[15] The Union further asserts that Dr. Lombardo had a duty to

_____

[15]The CBA provides that "[t]o the extent that federal law does not govern the implementation of this Agreement, this Agreement shall be construed and interpreted under, and shall be governed by, the laws applicable to contracts made and performed in the State of New York." CBA, art. LIX. The NFL does not dispute that New York

issue the same disclosure as a fiduciary in connection with his role as Independent Administrator of the Policy and as a physician. However, the Union has offered no authority clearly articulating such a public policy under New York law. Because the Union has failed to demonstrate an explicit, well defined, and dominant public policy requiring such a disclosure, see W.R. Grace & Co., 461 U.S. at 766; Ace Elec. Contractors, 414 F.3d at 900, this narrow ground does not provide a basis for vacating the awards.

Finally, the Union argues that the awards must be vacated because they are tainted by the arbitrator's evident partiality. Specifically the Union asserts that it first learned that the arbitrator gave both the Vikings and the Commissioner legal advice on the subject matter of the arbitrations, during discovery in this case.

The FAA allows a court to vacate an award for an arbitrator's "evident partiality." 9 U.S.C. § 10(a)(2). Evident partiality exists where the non-disclosure at issue "*objectively* demonstrate[s] such a degree of partiality that a reasonable person could assume that the arbitrator had improper motives." Dow Corning Corp. v. Safety Nat'l Cas. Corp., 335 F.3d 742, 750 (8th Cir. 2003) (quotation omitted). This is a "heavy burden." Choice Hotels Int'l, Inc. v. SM Prop. Mgmt., LLC, 519 F.3d 200, 212 (4th Cir. 2008) (quoting Three S. Del., Inc. v. DataQuick Info. Sys., Inc., 492 F.3d 520, 527 (4th Cir. 2007)). This standard "is not made out by the mere appearance of bias." 3 Fed. Proc. § 4:119 (Lawyers ed. 2009).

First, "the parties to an arbitration choose their method of dispute resolution, and can ask no more impartiality than inheres in the method they have chosen." Winfrey, 495 F.3d at 551 (quotation omitted). The Union agreed in the Policy that "the Commissioner or his designee will preside as Hearing Officer." Policy, § 10. Here, the designee was Jeffrey Pash, the NFL's general counsel, and it is undisputed

law governs this issue.

that there was no objection to him serving as arbitrator prior to this lawsuit. The Union explains this failure as a result of the fact that they did not learn of the basis for Pash's alleged evident partiality until discovery in this case. During discovery, the Union learned that Pash met with the Vikings three times between October 23, 2008, and early November 2008, and, at some point, discussed the Players. Specifically, Pash described his statements to the Vikings as

> in the context of what I understood to be and was aware of threats of litigation that could arise out of this proceeding. And so I was framing my advice in that context . . . . I can't say that . . . I knew . . . at the very first that the Williams players . . . were involved. But I believe that at some point I knew that they were involved.

(No. 09-2249, Defs.-Appellees' Supp. App. 234.) Pash became aware of the Players' litigation threats from their attorney, Mr. Ginsberg. (Id.) Even if prior to discovery in this case the Union was not specifically aware of Pash's communication of the information he received from the Players' counsel to the Vikings and Commissioner, the Union cannot reasonably claim to be surprised that such discussion occurred given Pash's position as general counsel for the NFL. Thus, the Union waived any objection as to Pash's evident partiality premised on his communication of litigation threats to the NFL and the Vikings, which he learned of from the Players' counsel, by failing to object to the general counsel for the NFL serving as arbitrator.

Second, even if the Union has not waived this issue, the Union has failed to carry the "heavy burden," Choice Hotels Int'l, 519 F.3d at 212, of demonstrating that Pash's actions show evident partiality as the Union has not even alleged that Pash's actions were motivated by "improper motives." Dow Corning, 335 F.3d at 750. Either the Union has: (1) waived its objection to Pash serving as arbitrator by agreeing in the CBA that the Commissioner's designee (which is what Pash was) could serve as arbitrator or (2) failed to demonstrate evident partiality on Pash's part. Therefore, we decline to vacate the awards on this basis. In sum, we reject each of the Union's

arguments for vacating the awards.  Accordingly, we affirm the district court's order confirming the awards.

IV.

For the foregoing reasons, we affirm the judgment of the district court in all respects.

_____