ROBERT W. PRATT, District Judge
Before the Court is Defendants URS Energy & Construction, Inc. (URS) and AECOM's Motion for Summary Judgment filed October 2, 2017. ECF No. 48. Plaintiffs Marc Pia and Jerry Oppat filed a resistance to Defendants' Motion on October 23, 2017. ECF No. 54. Defendants filed a reply on November 2, 2017. ECF No. 65. This Court heard oral arguments on the motion on December 13, 2017. See ECF No. 75. Following oral argument, this Court entered an Order staying the case pending a decision by the Iowa Supreme Court. ECF No. 76. On June 22, 2018, the parties submitted a Joint Status Report, notifying the Court that the Iowa Supreme Court had issued its decision. ECF No. 79. After the stay was lifted, the parties filed supplemental briefs supporting their positions. ECF Nos. 82, 89, 90. The matter is fully submitted.
I. FACTUAL AND PROCEDURAL BACKGROUND
Plaintiff Pia is a resident of Georgia, and Plaintiff Oppat is a resident of Montana. ECF No. 48-2 ¶¶ 3, 4. Both are employed as pipefitters and are members of United Association of Plumbers & Pipefitters (UA) Local 364 in Colton, California. Id. ¶ 5. Plaintiff Pia has worked as a union journeyman pipefitter since 2000. ECF No. 54-2 ¶ 1. Plaintiff Oppat has worked as a union journeyman pipefitter for over twenty-five years. Id. Plaintiffs receive referrals for work from local unions throughout the country and travel around working on various projects for extended periods of time. ECF No. 48-2 ¶ 5. In 2014, Plaintiffs received a referral from UA Local 125 in Keokuk, Iowa, to work for Defendant URS, a subcontractor on a project constructing the Iowa Fertilizer Plant in nearby Wever, Iowa (the Project).Id. ¶¶ 1, 6. On October 22, 2014, Plaintiffs began working for Defendant URS on the Project in the Wachs Tooling group, which required them to use a Wachs machine to cut industrial pipe. Id. ¶¶ 7, 12. For the *865 majority of their employment with Defendant URS, Plaintiff Oppat worked as a pipe foreman and Plaintiff Pia worked as a pipefitter on Oppat's crew. Id. ¶ 13. Plaintiffs trained other employees on the jobsite on how to operate the Wachs machines. ECF No. 54-2 ¶ 3.
Defendant AECOM acquired Defendant URS effective October 17, 2014. ECF No. 48-2 ¶ 2. Plaintiffs' employment with URS was governed by a collective bargaining agreement (CBA) called the National Construction Agreement (NCA). Id. ¶ 14. Plaintiffs deny ever receiving copies of the NCA. ECF Nos. 54-1 ¶¶ 14, 15, 16; 54-2 ¶¶ 4, 5. Article 13 of the NCA provides a procedure through which union employees can grieve disputes arising under the NCA, including decisions to terminate employment. ECF Nos. 48-2 ¶ 15, 48-3 at 194-95. Article 19 of the NCA governs safety on the jobsite, providing that employees are "bound by the safety rules and regulations as established by the Employer in accordance with the Construction Safety Act and [the Occupational Safety and Health Act (OSHA) ]," and that employers are responsible for "assur[ing] safe working conditions for [their] employees." ECF Nos. 48-2 ¶ 16, 48-3 at 198. Article 20 provides in part that "[a]ny employee who participates in or encourages any activities which interfere with the normal operation of the project shall be subject to disciplinary action, including discharge, and if justifiably discharged for the above reasons, shall not be eligible for rehire on the same project for a period of not less than ninety (90) days." ECF Nos. 48-2 ¶ 17, 48-3 at 198-200.
Defendant URS published and disseminated the Project Job Rules and Regulations that applied to all URS employees on the Project. ECF No. 48-2 ¶ 18. Plaintiffs both signed forms acknowledging they had received copies of the Project Job Rules and Regulations and agreed to comply with them. Id. ¶ 19; see ECF No. 48-3 at 104-12, 114-22. Category 1 of the Project Job Rules and Regulations is entitled "Zero Tolerance Offenses." ECF No. 48-3 at 110, 120. That section provides, "Category 1 violations will result in immediate termination of employment and employee will not be eligible for re-hire on the project" by Defendant URS. Id. at 110, 120. Such Zero Tolerance Offenses include "[w]illful or gross negligence of Security, Safety or Fitness for Duty Rules and Regulations" and "[v]erbal abuse, violence or threats of violence to other employees or fellow workers." Id. at 110-11, 120-21.
Both Plaintiffs acknowledge that, as union employees covered by the NCA, they could challenge Defendant URS's termination of their employment through the grievance process detailed in the NCA. ECF No. 54-1 ¶ 22. Plaintiffs allege they had never filed a grievance prior to their respective terminations from employment with URS. Id. Plaintiff Pia alleges he attempted to file a grievance following his termination but the local union hall refused to help him. Id. Plaintiffs acknowledge that had they brought grievances pursuant to the NCA, they would have alleged the same facts alleged in this action. Id. ¶ 23.
Defendants conducted daily safety meetings on the work site, which both Plaintiffs attended. ECF No. 1 ¶ 14.[1] Plaintiffs repeatedly *866 raised safety concerns during the meetings regarding the work site, including concerns relating to the workers' parking lot, which Defendant URS did not own or control but said it would take care of any issues involving the lot because its employees parked there. ECF Nos. 48-2 ¶ 25, 54-2 ¶ 13. Plaintiff Pia accused Defendants of violating safety standards established by OSHA. See ECF No. 1 ¶ 22. Plaintiff Oppat, as Pia's foreman, actively voiced his support for Pia in raising the safety issues. See id. ¶¶ 25, 31-32. Plaintiffs allege that at meetings on February 13 and 14, 2015, Steve Newman, a general foreman on the project and union member, threatened to fire any employee who continued to raise concerns that the jobsite parking lot was unsafe. ECF Nos. 1 ¶¶ 18-20, 29; 48-2 ¶ 24; 54-2 ¶ 13. Newman was a pipefitter who worked on the Project from August 18, 2014 through March 12, 2015. ECF No. 48-2 ¶ 27. Newman did not have any authority to fire anyone because he was not an employee of either Defendant and he was not involved in or consulted about the decisions to terminate Plaintiffs' employment, id. ¶ 28; ECF No. 66 ¶¶ 13, 14; however, Plaintiffs assert they both understood that Newman, as their general foreman, had the power to terminate their employment, ECF No. 54-1 ¶ 28. Plaintiffs also allege they raised safety concerns to Newman relating to a large, unbarricaded hole in the ground at the jobsite and a heavy pipe that they were unable to safely cut while it was suspended at an angle in a pipe rack, and Newman again threatened their jobs. ECF Nos. 48-2 ¶ 26; 54-2 ¶¶ 15, 16.
On February 28, 2015, during the morning safety meeting, Newman cut off any discussions about safety concerns relating to the jobsite parking lot. ECF No. 54-1 ¶ 29. Thereafter, Newman went to Plaintiff Oppat's crew's tent, where Plaintiff Pia "called [Newman] out on his lack of attention to safety on the jobsite." Id. ; ECF No. 54-2 ¶ 14. In response, Newman threatened Pia's job and left the tent. ECF Nos. 54-1 ¶ 29, 54-2 ¶ 14. Plaintiffs then turned to Mike Mitchell, who was the safety manager for Defendant URS. ECF Nos. 48-2 ¶ 29, 54-1 ¶ 29, 54-2 ¶ 17. Newman later admitted he was upset that Plaintiffs had gone directly to jobsite safety representatives rather than going through him. ECF No. 54-1 ¶ 24. Pia told Mitchell about his various safety concerns and conveyed his heightened concern for everyone on the jobsite due to the fact that he believed Newman was generally not concerned with safety. ECF Nos. 54-1 ¶ 29, 54-2 ¶ 17. Defendant URS then held a meeting to discuss Pia's safety concerns. ECF Nos. 48-2 ¶ 29, 54-2 ¶ 17. Present at the meeting were Plaintiffs; Mitchell; Mitch Wisenor, who was Assistant Director of Labor Relations for Defendant URS; Brad Peterson, who was a project supervisor for Defendant URS; and a union representative from Local 125. ECF No. 48-2 ¶ 29. During the meeting, Pia felt Peterson was threatening his job for again bringing up safety issues. ECF No. 54-2 ¶ 17; see ECF No. 1 ¶ 33. Following the meeting, Pia was escorted off the jobsite and did not return to work because he was terminated the following Monday, March 2. Id.
On March 2, 2015, Business Agents for Local 125, Pat Ellison and Bruce Beckman; project superintendents for Defendant URS Keith Williams and Chris Laney; and Assistant Director of Labor Relations Wisenor met with other employees, including Plaintiff Oppat, Jason Gorlewski, Kasey Minton, Scott Stewart, and Mike Pulley, to discuss safety concerns on the jobsite. ECF No. 48-2 ¶ 30. Plaintiff Oppat denies any involvement in this meeting. ECF No. 54-1 *867 ¶ 30. That same day, Wisenor called Plaintiff Pia on the phone. ECF No. 48-2 ¶ 31. Defendants assert Wisenor asked Pia to provide specific safety concerns that he wanted addressed in order for him to feel safe enough to return to work on the site, but Pia either could not or would not provide any detailed concerns for Defendant URS to address. Id. Plaintiffs deny Defendants' claim and assert Pia was never unwilling to provide specific details of safety concerns for URS to remedy. ECF No. 54-1 ¶ 31. Plaintiffs assert that in the phone call on March 2, Pia was not asked about specific safety concerns that he had, and instead his employment was terminated when he reiterated that he would return to work when his safety concerns had been addressed. Id. Defendants assert that because Pia was unable to articulate any specific safety concerns that URS could remedy to make Pia feel safe on the job, Wisenor decided to terminate Pia's employment on the grounds that he was unable to perform his duties.[2] ECF Nos. 48-2 ¶ 32, 54-2 ¶ 19.
Following his termination, Pia went to Local 125 to file a grievance regarding his termination. Id. ¶ 33; ECF No. 54-2 ¶ 10. Defendants assert that, because Pia was unable to tell union Business Agent Ellison any specific safety concerns he had, Ellison informed Pia that Local 125 would not pursue a grievance. ECF No. 48-2 ¶ 33. Plaintiff Pia asserts Ellison told him that Local 125 would not file a grievance because it was lucky to have a project of that size so close and it viewed him as a "problem child." ECF Nos. 54-1 ¶ 33; 54-2 ¶¶ 10, 22.
Also on March 2, Norm Miller, while looking through the trash, found all of the manuals and several tool bits used to make cuts with the Wachs machines; Oppat told Miller that he had thrown the manuals and tool bits away. ECF No. 48-2 ¶ 34. Oppat asserts that while he did throw these items in the trash, the only tools he threw out were broken and no longer usable and the manuals were just promotional material. ECF No. 54-1 ¶ 34. Oppat further asserts that, over the course of his career as a pipefitter, he has made the decision to throw out tooling used with "WACHS machines on thousands of occasions," and no one has ever told him that he should not throw the tooling away or that he was not doing his job properly. Id.
On March 4, 2015, Wisenor met with Plaintiff Oppat to discuss the matter after an area supervisor told Wisenor that Oppat had thrown out new and used tools and manuals. ECF No. 48-2 ¶ ¶ 35, 36. Wisenor also planned to meet with Miller to discuss his knowledge of the incident, but as Miller made his way into Wisenor's office, Oppat threatened Miller, calling Miller a "piece of shit" and telling Miller that he was going to fight him in the parking lot. Id. ¶ 37. Defendants assert Wisenor terminated Oppat's employment because of his threat of violence toward Miller. Id. ¶ 38. Oppat acknowledges he met with Wisenor on *868 March 4, but asserts he does not know the purpose of that meeting because his employment had been terminated prior to it.[3] ECF No. 54-1 ¶ 36. Oppat also acknowledges he threatened Miller because he was angry. Id. ¶ 37. Oppat asserts he had been friends with Miller for a long time and had helped him get the job working on Oppat's crew. Id. Oppat also asserts that, prior to March 4, he had been demoted from foreman of his crew and had learned during the meeting with Wisenor on March 4 that Miller would succeed Oppat as foreman. Id. ; ECF No. 54-2 ¶ 18. Thus, Oppat felt angry and betrayed by Miller because he agreed to take Oppat's place as foreman. ECF No. 54-2 ¶ 18. Oppat admits he did not attempt to bring a grievance against Defendant URS because he believed doing so would be a waste of time. Id. ¶ 39; ECF No. 54-2 ¶ 6.
Defendants assert that other employees, including Gorlewski, Minton, and Pulley, also brought up safety concerns on the jobsite and were not fired as a result. ECF No. 48-2 ¶¶ 41, 42. Plaintiffs acknowledge that although this is true, none of these other employees were involved in the decision to bring the safety concerns directly to Mitchell nor did they participate in the February 28, 2015 meeting during which Peterson threatened to discharge Pia. ECF No. 54-1 ¶ 41.
Plaintiffs Pia and Oppat filed separate Complaints with this Court on June 1 and 2, 2016, respectively, alleging state-law claims of wrongful discharge in violation of public policy. Case No. 3:16-cv-00045; ECF No. 1; Case No. 3:16-cv-00046, ECF No. 1. Specifically, Plaintiffs claim Defendants wrongfully discharged them from employment after they engaged in the protected activity of raising complaints of safety violations on the jobsite. On January 4, 2017, this Court denied Defendants' Motion to Dismiss. ECF No. 23. On June 15, 2017, the Court consolidated the cases for all purposes, including trial. ECF No. 39. On October 2, 2017, Defendants filed the present Motion for Summary Judgment. ECF No. 48. Following oral argument, the Court stayed the proceedings in this case pending a decision by the Iowa Supreme Court in Ackerman v. State , 913 N.W.2d 610, 613 (Iowa 2018). ECF No. 76. On June 27, 2018, the Court lifted the stay and allowed the parties' to file supplemental briefs in support of their positions on the present motion. ECF No. 82.
II. SUMMARY JUDGMENT STANDARD
The term "summary judgment" is something of a misnomer. See D. Brock Hornby, Summary Judgment Without Illusions , 13 Green Bag 2d 273 (Spring 2010). Although it "suggests a judicial process that is simple, abbreviated, and inexpensive," in reality the process is complicated, time-consuming, and expensive.[4] Id. at 273, 281. The complexity of the process for determining whether summary judgment is appropriate, however, reflects the "complexity of law and life." Id. at 281. "Since the constitutional right to jury trial is at stake," judges must engage in a "paper-intensive and often tedious" process to "assiduously avoid deciding disputed facts or inferences" in a quest to determine whether a record contains genuine factual disputes that necessitate a trial. Id. at 281-82. Despite the seeming inaptness of the name and the desire for some in the plaintiffs' bar to be rid of it, the summary *869 judgment process is well-accepted and appears to be "here to stay."[5] Id. at 281. Indeed, "judges are duty-bound to resolve legal disputes, no matter how close the call." Id. at 287.
"[S]ummary judgment is an extreme remedy, and one which is not to be granted unless the movant has established his right to a judgment with such clarity as to leave no room for controversy and that the other party is not entitled to recover under any discernible circumstances." Robert Johnson Grain Co. v. Chem. Interchange Co. , 541 F.2d 207, 209 (8th Cir. 1976). The purpose of summary judgment is not "to cut litigants off from their right of trial by jury if they really have issues to try." Poller v. Columbia Broad. Sys. , Inc. , 368 U.S. 464, 467, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962) (quoting Sartor , 321 U.S. at 627, 64 S.Ct. 724 ). Rather, it is designed to avoid "useless, expensive and time-consuming trials where there is actually no genuine, factual issue remaining to be tried." Anderson v. Viking Pump Div. , Houdaille Indus. , Inc. , 545 F.2d 1127, 1129 (8th Cir. 1976).
Federal Rule of Civil Procedure 56(a) provides, "A party may move for summary judgment, identifying each claim or defense-or the part of each claim or defense-on which summary judgment is sought." Rule 56(a) mandates the entry of summary judgment upon motion after there has been adequate time for discovery "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Summary judgment is proper when the record, viewed in the light most favorable to the nonmoving party and giving that party the benefit of all reasonable inferences, shows there is no genuine issue of material fact and the moving party is therefore entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a) ; Matsushita Elec. Indus. Co. v. Zenith Radio Corp. , 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ; Harlston v. McDonnell Douglas Corp. , 37 F.3d 379, 382 (8th Cir. 1994). A disputed issue is "genuine" when the evidence produced "is such that a reasonable jury could return a verdict for the nonmoving party." See Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is considered "material" if it "might affect the outcome of the suit under the governing law." See id. "[T]he substantive law will identify which facts are material .... Factual disputes that are irrelevant or unnecessary will not be counted." Id.
"In considering a motion for summary judgment the court does not weigh the evidence, make credibility determinations, or attempt to discern the truth of any factual issue." Great Plains Real Estate Dev., L.L.C. v. Union Cent. Life Ins. Co. , 536 F.3d 939, 944 (8th Cir. 2008) (quoting Morris v. City of Chillicothe , 512 F.3d 1013, 1018 (8th Cir. 2008) ). Rather, the court only determines whether there are any disputed issues concerning the existence of material facts and, if so, whether those disputes are genuine. See Anderson , 477 U.S. at 251-52, 106 S.Ct. 2505 ; see also Wilson v. Myers , 823 F.2d 253, 256 (8th Cir. 1987) ("Summary judgment *870 is not designed to weed out dubious claims, but to eliminate those claims with no basis in material fact."). Summary judgment is appropriately entered against a party who has failed to make a showing sufficient to establish a genuine dispute as to the existence of an element essential to its case and upon which the party will bear the burden of proof at trial. See Celotex Corp. v. Catrett , 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).
When a summary judgment motion is filed, the moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact based on the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any. See id. at 323, 106 S.Ct. 2548 ; Anderson , 477 U.S. at 248, 106 S.Ct. 2505. If the moving party has carried its burden, the nonmoving party must then go beyond its original pleadings and designate specific facts showing that there remains a genuine issue of material fact that needs to be resolved by a trial. See Fed. R. Civ. P. 56(c). This additional showing can be by affidavits, depositions, answers to interrogatories, or admissions in the record. Id. ; Celotex , 477 U.S. at 322-23, 106 S.Ct. 2548 ; Anderson , 477 U.S. at 257, 106 S.Ct. 2505. "[T]he mere existence of some alleged factual dispute between the parties will not defeat a motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson , 477 U.S. at 247-48, 106 S.Ct. 2505. Indeed, "[t]o survive a motion for summary judgment, the nonmoving party must substantiate his allegations with sufficient probative evidence [that] would permit a finding in [his] favor based on more than mere speculation, conjecture, or fantasy." Barber v. C1 Truck Driver Training, LLC , 656 F.3d 782, 801 (8th Cir. 2011) (second and third alterations in original) (quoting Putman v. Unity Health Sys. , 348 F.3d 732, 733-34 (8th Cir. 2003) ). Mere "self-serving allegations and denials are insufficient to create a genuine issue of material fact." Anuforo v. Comm'r , 614 F.3d 799, 807 (8th Cir. 2010).
Courts do not decide whether to grant a motion for summary judgment by conducting a paper trial. Rather, a "district court's role in deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." Waldridge v. Am. Hoechst Corp. , 24 F.3d 918, 920 (7th Cir. 1994). In considering a motion for summary judgment, the court's task is merely to decide, based on the evidentiary record that accompanies the filings of the parties, whether there really is any genuine issue concerning a material fact that still requires a trial. See id. (citing Anderson , 477 U.S. at 249, 106 S.Ct. 2505 and 10 Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 2712 (3d ed. 1998) ); see also Fed. R. Civ. P. 56(c)(3).
III. ANALYSIS
Defendants assert the Court should grant summary judgment in favor of Defendant AECOM, Defendant URS's parent company, and dismiss it from the case because Plaintiffs cannot prove they were employed by AECOM. Next, Defendants claim the Court should grant their motion because Plaintiffs' claims are preempted by the Labor Management Relations Act of 1947 (LMRA), 29 U.S.C. § 141 et seq. Defendants also ask the Court to reconsider its prior Order denying Defendants' Motion to Dismiss, claiming Plaintiffs' claims are preempted by the National Labor Relations Act of 1935 (NLRA), 29 U.S.C. § 151 et seq. Defendants further claim the Court should grant their motion for summary judgment because Plaintiffs cannot demonstrate a genuine issue of material fact that their engagement in a protected activity was the determining factor in their discharge from employment. Finally, *871 Defendants assert that, even if Plaintiffs have shown a genuine factual dispute to be resolved at trial, the Court should limit the amount of damages Plaintiffs can recover.
A. Plaintiffs' Employer
Defendant AECOM contends it was not Plaintiffs' employer but rather simply the parent company of Plaintiffs' actual employer, Defendant URS; thus, the Court should grant summary judgment in its favor. "There is a 'strong presumption that a parent company is not the employer of its subsidiary's employees, and the courts have found otherwise only in extraordinary circumstances.' " Brown v. Fred's, Inc. , 494 F.3d 736, 739 (8th Cir. 2007) (citation omitted). "A parent company may employ its subsidiary's employees if (a) the parent company so dominates the subsidiary's operations that the two are one entity and therefore one employer or (b) the parent company is linked to the alleged discriminatory action because it controls 'individual employment decisions.' " Id. (citation omitted).
Defendant AECOM acquired Defendant URS effective October 17, 2014, approximately five days before Plaintiffs began working on the Iowa Fertilizer Plant project. Plaintiff Oppat testified in his deposition that he was an employee of URS and he did not know whether he had even brought suit against AECOM. Plaintiff Pia testified he worked for URS, not AECOM, and it was URS's name that appeared on his hardhat and all of his employment paperwork. Additionally, Defendants have presented evidence it was URS that issued employment-related documents to Plaintiffs and each management-level employee who Plaintiffs claim was involved in the decision to terminate their employment was an employee of URS and not AECOM. Based upon this record, the Court finds Plaintiffs have not provided any evidence to demonstrate a genuine issue for trial that AECOM "so dominate[d] [URS]'s operations" or "control[led] 'individual employment decisions' " such that a reasonable jury could find that AECOM was Plaintiffs' employer. Therefore, the Court concludes Defendant AECOM is entitled to summary judgment as a matter of law.
B. LMRA Preemption
Defendants claim that because the Court must interpret the NCA in order to determine whether Defendant URS wrongfully discharged Plaintiffs in retaliation for raising safety concerns on the jobsite, Plaintiffs' claims for wrongful termination in violation of public policy are preempted under the LMRA. Specifically, Defendants argue this Court must analyze the NCA's safety provision that required URS to provide a safe workplace for its employees to determine (1) what steps URS needed to take to ensure a safe workplace and whether it took those steps, (2) whether Plaintiffs raised valid safety complaints regarding issues that URS was responsible for under the NCA, and (3) whether URS violated the NCA by failing to address Plaintiffs' safety concerns. Defendants also point to Article 19 of the NCA, which provides a process through which Plaintiffs could have sought protection from URS's actions through union representation and the grievance procedure described therein. Additionally, Defendants assert that Plaintiffs' claims are also barred by the six-month statute of limitations of LMRA claims.
In their response, Plaintiffs argue that their claims do not require interpretation of the NCA. Instead, they contend their claims require the Court to interpret state and federal safety regulations and the laws that have adopted these regulations rather than any provision of the NCA requiring URS to provide a safe workplace for its *872 employees; thus, their claims are not preempted by the LMRA.
Both parties' arguments are misguided. This Court does not need to interpret the safety provision of the NCA or the relevant federal and state workplace safety laws in order to analyze Plaintiffs' claims. Nor does this Court need to determine whether Plaintiffs' safety complaints were valid. Rather, in determining whether Plaintiffs' claims are preempted by the LMRA, this Court must determine whether Plaintiffs' claims for wrongful discharge in violation of public policy are rooted in the NCA or whether there are state-law rights to assert a claim of retaliatory discharge that are independent of the NCA.
Section 301(a) of the LMRA provides, in pertinent part:
Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.
29 U.S.C. § 185(a).
"The Supreme Court has held that federal law exclusively governs suits for breach of a CBA and 'that the pre-emptive force of [section] 301 extends beyond state-law contract actions.' " Williams v. Nat'l Football League , 582 F.3d 863, 873-74 (8th Cir. 2009) (alteration in original) (citations omitted). Thus, section 301 completely preempts state law "claims founded directly on rights created by [CBAs], and also claims 'substantially dependent on analysis of a [CBA].' " Caterpillar Inc. v. Williams , 482 U.S. 386, 394, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987) (quoting International Broth. of Elec. Workers, AFL-CIO v. Hechler , 481 U.S. 851, 859 n.3, 107 S.Ct. 2161, 95 L.Ed.2d 791 (1987) ). "Where a state law claim is based on a [CBA] or is 'inextricably intertwined' with the contents of a [CBA], the claim is subject to [section] 301(a) preemption." Schuver v. MidAmerican Energy Co. , 154 F.3d 795, 799 (8th Cir. 1998) (quoting Allis-Chalmers Corp. v. Lueck , 471 U.S. 202, 213, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985) ).
"Of course, not every dispute concerning employment, or tangentially involving a provision of a [CBA], is pre-empted by [section] 301 or other provisions of the federal labor law." Allis-Chalmers Corp. , 471 U.S. at 211, 105 S.Ct. 1904 ; see Williams , 582 F.3d at 874. Indeed, "it would be inconsistent with congressional intent under [section 301] to pre-empt state rules that proscribe conduct, or establish rights and obligations, independent of a labor contract." Id. at 212, 105 S.Ct. 1904. "[Section] 301 pre-emption merely ensures that federal law will be the basis for interpreting [CBAs], and says nothing about the substantive rights a State may provide to workers when adjudication of those rights does not depend upon the interpretation of such agreements." Lingle v. Norge Div. of Magic Chef, Inc. , 486 U.S. 399, 409, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988). "[I]t is not enough that the events in question took place in the workplace or that a CBA creates rights and duties similar or identical to those on which the state-law claim is based." Meyer v. Schnucks Markets, Inc. , 163 F.3d 1048, 1051 (8th Cir. 1998).
The Eighth Circuit has instructed that, in applying the section 301 preemption doctrine, courts must "begin with 'the claim itself,' and apply a two-step approach in order to determine if the claim is sufficiently 'independent' to survive section 301 preemption." Williams , 582 F.3d at 874 (citations omitted).
*873 First, a "state-law claim is preempted if it is 'based on' [a] ... provision of the CBA," meaning that "[t]he CBA provision at issue" actually sets forth the right upon which the claim is based. Second, section 301 preemption applies where a state-law claim "is 'dependent upon an analysis' of the relevant CBA," meaning that the plaintiff's state-law claim requires interpretation of a provision of the CBA.
Id. (quoting Bogan v. Gen. Motors Corp. , 500 F.3d 828, 832 (8th Cir. 2007) ).
Defendants contend "the NCA is not merely implicated because Plaintiffs could have grieved their discharges," but rather "[t]he NCA is the basis for Plaintiffs' claims." ECF No. 65 at 2. Defendants correctly note that LMRA preemption does not turn on whether a plaintiff has filed a grievance. To be sure, "[t]he Supreme Court has held that the fact that a CBA provides for [a grievance process] for claims based on the same facts as those forming the basis for a plaintiff's complaint does not mean that state-law causes of action based on those facts are preempted." Meyer , 163 F.3d at 1050. "A plaintiff is the master of his or her cause of action, and the fact that a claim could have been laid as a violation of a CBA does not necessarily mean that the LMRA preempts it." Id.
Nevertheless, Defendants are incorrect in their assertion that Plaintiffs' claims for wrongful discharge in violation of a public policy are "based on" a provision of the NCA. The Iowa Supreme Court has specifically recognized the tort of wrongful discharge in violation of public policy for complaining of safety violations. See George v. D.W. Zinser Co. , 762 N.W.2d 865, 871 (Iowa 2009) (holding "an individual can bring a claim of retaliatory discharge for reporting [Iowa's Occupational Safety and Health Act (IOSHA) ] violations"); see also Kohrt v. MidAmerican Energy Co. , 364 F.3d 894, 902 (8th Cir. 2004) (predicting "the Supreme Court of Iowa would conclude that an employee may bring a common law wrongful discharge suit premised on a violation of Iowa's public policy as declared" under IOSHA). Thus, the NCA does not "actually set[ ] forth the right upon which [Plaintiffs'] claim[s are] based"-state tort law does. Williams , 582 F.3d at 874 (citation omitted).
Next, the Court must examine whether Plaintiffs' claims for wrongful discharge in violation of public policy are "dependent upon an analysis" of the NCA. Williams , 582 F.3d at 874 (citation omitted). The Supreme Court has held " 'purely factual questions' about an employee's conduct or an employer's conduct and motives do not 'requir[e] a court to interpret any term of a [CBA].' " Hawaiian Airlines, Inc. v. Norris , 512 U.S. 246, 261, 114 S.Ct. 2239, 129 L.Ed.2d 203 (1994) (alteration in original) (quoting Lingle , 486 U.S. at 407, 108 S.Ct. 1877 ). In Norris ,[6] the Supreme Court noted that, "[t]he state-law retaliatory discharge claim turned on just this sort of purely factual question: whether the employee was discharged ..., and, if so, whether the employer's motive in discharging [the employee] was to deter or interfere with [the employee's] exercise of rights under Illinois worker's compensation law." 512 U.S. at 262, 114 S.Ct. 2239. Similarly, this case involves a "purely factual question": whether Defendant URS
*874 terminated Plaintiffs' employment in retaliation for their having complained of safety violations.
In Iowa, "[a]n action for the tort of wrongful discharge exists when a protected activity has been recognized through the implementation of an underlying public policy that would be undermined if an employee were discharged from employment for engaging in that activity." Davis v. Horton , 661 N.W.2d 533, 535 (Iowa 2003). In order to state a claim for wrongful discharge in violation of public policy, a plaintiff must prove: "(1) engagement in a protected activity, (2) adverse employment action, and (3) a causal connection between the two." Rivera v. Woodward Resource Ctr. , 865 N.W.2d 887, 894 (Iowa 2015) (quoting Teachout v. Forest City Cmty. Sch. Dist. , 584 N.W.2d 296, 299 (Iowa 1998) ). Each of these elements is a pure factual inquiry "pertain[ing] to the conduct of the employee[s] and the conduct and motivation of the employer," and none of these "elements requires a court to interpret any term of a [CBA]." Lingle , 486 U.S. at 407, 108 S.Ct. 1877 ; see Meyer v. Schnucks Markets, Inc. , 163 F.3d 1048, 1051 (8th Cir. 1998). "Thus, the state-law remedy in this case is 'independent' of the [CBA] in the sense of 'independent' that matters for [section] 301 pre-emption purposes: resolution of the state-law claim does not require construing the [CBA]." Lingle , 486 U.S. at 407, 108 S.Ct. 1877 ; see Conaway v. Webster City Prod. Co. , 431 N.W.2d 795, 799 (Iowa 1988).
Accordingly, the Court concludes the state-law cause of action here-wrongful termination in violation of public policy-is not preempted by the LMRA because it involves a right that exists independent of the NCA and the Court does not need to interpret any provisions of the NCA to analyze Plaintiffs' claims. Norris , 512 U.S. at 260, 114 S.Ct. 2239.
C. NLRA Preemption
On January 4, 2017, this Court denied Defendants' respective motions to dismiss. ECF No. 23. In its Order, the Court determined "Iowa has a legitimate and substantial interest in maintaining the physical safety of employees throughout the state and the level of risk of interfering with the [National Labor Relations Board]'s exclusive jurisdiction as to a number of Plaintiff[s'] requested remedies is negligible." Id. at 11. Thus, the Court concluded Plaintiffs' claims for wrongful discharge in violation of public policy are not preempted by the NLRA. Id.
Defendants now ask this Court to reconsider its prior decision, claiming that the benefit of a more developed factual record demonstrates that Plaintiffs' claims are in fact preempted by the NLRA. However, Defendants do not argue any new grounds as a basis for this request. Therefore, for the reasons stated in this Court's prior decision, Defendants' request is denied. See Morris v. Am. Nat. Can Corp. , 988 F.2d 50, 52 (8th Cir. 1993) ("The law of the case is a doctrine that provides that 'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.' " (quoting Arizona v. California , 460 U.S. 605, 618, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983) ) ).
D. Stating a Claim for Relief
While this case has been pending in this Court, the Iowa appellate courts have been examining the issue of whether a plaintiff, who is covered by a CBA, can assert a claim for wrongful discharge in violation of public policy. Prior to the Court's hearing on the summary judgment motion, the Iowa Court of Appeals decided Ackerman v. State , No. 16-0287, 2017 WL 1735630, at *6 (Iowa Ct. App. May 3, 2017), which held in an unpublished opinion that the common-law tort of wrongful *875 discharge in violation of public policy is available to an individual whose employment is governed by a CBA. Following this decision, the Iowa Supreme Court granted the State's application for further review, Ackerman v. State , 913 N.W.2d 610, 613 (Iowa 2018), and this Court stayed the action pending its decision, ECF No. 76. The Iowa Supreme Court unanimously affirmed the decision of the court of appeals. Ackerman , 913 N.W.2d at 621. Both parties filed supplemental briefs to further aid the Court in ruling on the present motion in light of the Ackerman holdings. ECF Nos. 89, 90. In their supplemental brief, Defendants correctly acknowledge that, under Ackerman , Plaintiffs may assert wrongful-discharge claims against Defendant URS. However, Defendants claim, the applicability of Ackerman to the instant case ends there. Defendants contend Plaintiffs have failed to raise a genuine issue of material fact that their employment was terminated as a result of their complaints relating to safety at the jobsite.
As noted above, in order to state a claim for wrongful discharge in violation of public policy, Plaintiffs must show (1) they engaged in a protected activity, (2) they suffered an adverse employment action, and (3) there was a causal connection between the first two elements. Rivera , 865 N.W.2d at 894. In Iowa, "[t]he causation standard in a common-law retaliatory discharge case is high." Teachout , 584 N.W.2d at 301. "[I]n order to prevail on a wrongful discharge claim in violation of public policy, the plaintiff must show the protected conduct was the determining factor in the adverse employment action." Rivera , 865 N.W.2d at 898 (emphasis added). "[A] determining factor is one that tips the balance in an employment decision." Id. "In order to be the determining factor, it is not necessary the protected conduct be 'the main reason behind the decision,' but it must be the factor that makes the difference in the employment outcome." Id. "Iowa law does not impose liability on an employer when the determining factor was a legitimate business reason and unlawful retaliation was simply a motivating factor." Id. Furthermore, although a plaintiff is not required to prove the lack of an overriding legitimate business justification, such evidence may be relevant and "an employer will prevail if it convinces the fact finder that the legitimate business reasons supporting the action were so strong as to defeat the conclusion that the protected conduct was the determining factor in the adverse employment decision." Id. at 898-99.
For the purposes of summary judgment, Defendants do not dispute Plaintiffs can demonstrate the first two elements-that Plaintiffs have (1) engaged in a protected activity and (2) suffered an adverse employment action. Instead, Defendants contend Plaintiffs cannot demonstrate a genuine issue of material fact as to the third element-a causal connection between their complaints of safety violations and their termination from employment with URS.
Defendants argue the facts are undisputed that Plaintiffs' complaints of safety violations were not the determining factor in URS's decision to terminate their employment. First, Defendants contend that Newman, the person who allegedly threatened Plaintiffs' jobs after they raised safety concerns, did not have the authority to make employment decisions. Second, Defendants argue they had meetings with Plaintiffs and local union representatives were present to discuss the safety concerns raised by Plaintiffs and to try to resolve them, but even after these meetings Pia was unable to point to any specific safety concerns that URS could remedy in order for Pia to safely return to work. Defendants claim it was Pia's failure to articulate particular safety concerns and *876 his subsequent refusal to return to work until these unspecified concerns were addressed that was the determining factor in his termination, not simply because he raised safety complaints. Thus, Defendants claim they rightfully fired Pia for failing to perform his job duties pursuant to the Project Job Rules and Regulations. With regard to Plaintiff Oppat's termination, Defendants claim the determinative factor in Oppat's discharge from employment was the fact that he called a coworker a "piece of shit" and threatened to beat him up in the parking lot, a violation of the Project Job Rules and Regulations-not that Oppat complained about safety violations on the jobsite.
Plaintiffs assert Defendants' reasons for their termination are pretextual and there are genuine issues of material fact to be decided by the factfinder at trial. Plaintiffs contend "Defendants have a serious problem with regard to the timing of the termination of Pia and Oppat." ECF No. 54 at 19. Plaintiffs note it is undisputed that safety meetings occurred on February 28, 2015, and that Pia was terminated the first working day thereafter on March 2, and Oppat was demoted two working days after those meetings and then terminated on March 4, the day after his demotion.
It is true that "[t]he mere fact that an employee's termination follows his engaging in protected conduct is not sufficient to generate a jury question on causation." Salah v. Diamond Crystal Brands, Inc. , 241 F.Supp.3d 893, 899 (S.D. Iowa 2016) (citing Teachout , 584 N.W.2d at 302-03 (collecting cases) ). However, the record reveals sufficient evidence to raise the level of suspicion that Plaintiffs' employment was terminated for complaining about safety violations above that of "mere speculation, conjecture, or fantasy." Barber , 656 F.3d at 801. It is undisputed that Plaintiffs repeatedly raised concerns about safety violations on the jobsite and in the parking lot where they were required to park. For purposes of summary judgment, the Court accepts as true, as it must, Plaintiff Pia's testimony and finds that Pia provided specific safety concerns that he wanted addressed in order for him to feel safe enough to return to work on the jobsite and Defendant URS fired him in retaliation as a result. Plaintiff further testified that during one of the meetings on February 28, Peterson threatened Pia's employment because he raised safety complaints and that after the meeting, Pia was escorted off of the jobsite. The Court must also accept as true Pia's testimony that following his termination, he went to the local union hall to file a grievance and union Business Agent Ellison-who had been present during the February 28 meeting with URS management-refused, telling Pia that the union would not file a grievance for him because they were lucky to even have the Project to work on and Pia was a "problem child" anyway.
Likewise, although Plaintiff Oppat admits he angrily threatened violence toward Miller on March 4, 2015, his assertion that he was discharged from his employment before he went to the meeting with Wisenor on March 4 to discuss the manuals and tools he had thrown out must be taken as true. Additionally, although Defendants offer evidence that other employees also complained of safety violations and were not terminated as a result, Plaintiffs point out that these other employees were not involved in the decision to go over Newman's head and directly go to Mitchell with their complaints; thus, they are not similarly situated to Plaintiffs.
It is not this Court's role to determine the credibility of the witnesses in this case, but rather, that is the role of the factfinder. See Great Plains Real Estate Dev., L.L.C. , 536 F.3d at 944 ; Waldridge , 24 F.3d at 920. Based on the facts in this *877 record, the Court finds Plaintiffs have put forth sufficient evidence from which a reasonable jury could conclude that their repeated complaints of safety violations on the jobsite were "the determining factor" in Defendant URS's decisions to terminate their employment. Rivera , 865 N.W.2d at 898 ; see Robert Johnson Grain Co. , 541 F.2d at 209. Accordingly, the Court concludes Plaintiffs have raised genuine disputes of material fact such that judgment as a matter of law is not appropriate in this case.
E. Damages
Finally, Defendants argue that any back pay Plaintiffs might receive in pursuit of their claims is limited as a matter of law. Specifically, Defendants contend any awards for back pay should be limited because even if Plaintiffs had not been discharged in early March 2015, their employment with Defendant URS would have ended shortly thereafter anyway. Defendants also contend any back pay Plaintiff Pia may be entitled to must be limited because he cannot recover back pay for the time period he was disabled following his termination.
1. Defendant URS's Subcontract Termination
On April 17, 2015, Defendant URS's subcontract, under which it provided services to the Project, was terminated, and URS laid off approximately 1200 to 1300 union employees, including the pipefitters in the Wachs tooling group who had the same experience and positions as Plaintiffs. ECF No. 48-2 ¶ 40; see ECF No. 54-2 ¶ 27. When a new subcontractor began work on the Project shortly thereafter, several former pipefitters for URS with whom Plaintiffs had worked were hired by the new subcontractor to work on the Project. ECF No. 54-2 ¶ 25. Hiring for the new subcontractor was accomplished, at least in part, through referrals from the local union hall. ECF No. 54-3 at 108. Thus, Defendants argue, even if they are found liable for wrongfully discharging Plaintiffs, their liability it limited to the period between their respective discharge dates and when URS's subcontract on the Project was terminated because URS cannot be held liable for any failure by Local 125 to refer Plaintiffs to work on the Project for a new subcontractor.
Plaintiffs assert that, following their terminations, they were contacted by representatives of the new subcontractor and were asked to return to work on the Project, but were later told that they would not be returning to the jobsite because they had been blackballed by Local 125. ECF Nos. 54-1 ¶ 40; 54-2 ¶¶ 20, 21. Pia testified at his deposition that, when he spoke to the representative of the new subcontractor, Pia informed him that Pia "had previously been terminated over a safety issue" and the representative "assured [Pia] that that was not a problem, that we could still move forward." ECF No. 54-3 at 23. Pia further testified he called the new subcontractor back before he booked his travel to Iowa to confirm that the local union hall would not have a problem with him returning to work on the Project and Pia was told there was no problem. Id. at 24. Pia testified that it was not until he was supposed to return to Iowa to restart work on the Project that the new subcontractor called the local union hall, who told the new subcontractor "they would no longer employ [Pia], that [he] would no longer work out of Local 125 ever." Id. at 23. However, Pia testified it was simply his belief that the local union hall did not want him back on the job because of URS-not that anyone told him that. Id. at 26. Plaintiff Oppat also testified that he was told he was blackballed by the local union hall and would never work out of their local hall again. Id. at 150. Plaintiffs contend that URS's termination of *878 their employment tainted the local union hall's view of them and caused it to blackball them, otherwise they would have been hired by the new subcontractor given their special skills and experiences. See ECF No. 54-2 ¶ 26.
Several courts have held that back pay may be limited to the period between when the plaintiff suffered the adverse employment action and the date "when he or she would not have been on the job in any event, for a reason unrelated to the illegal conduct of the employer." Mennen v. Easter Stores , 951 F.Supp. 838, 860 (N.D. Iowa 1997) (citing Meschino v. Int'l Tel. & Tel. Corp. , 661 F.Supp. 254, 257 (S.D.N.Y. 1987) (prevailing plaintiff may not recover damages for the period after which he would have been terminated for a non-discriminatory reason; evidence indicated that plaintiff would have lost employment due to staff reductions and thus warranted limited back pay) ); see also Holley v. Northrop Worldwide Aircraft Servs., Inc. , 835 F.2d 1375, 1377 (11th Cir. 1988) (finding employer "cannot be held liable for the hiring decisions of other companies absent" convincing evidence to support the plaintiff's claim that he was not hired by the new company replacing his former employer on a government contract based upon his former employer's recommendation).
Assuming Plaintiffs' allegations against the local union hall are true-that it blackballed them and they were unable to work on the Project under the new subcontractor as a result-Plaintiffs have failed to set forth any specific facts from which a reasonable jury can infer that Defendant URS is somehow responsible for the new subcontractor's or the local union's decision not to rehire them to work on the Project. Plaintiffs claim they "will offer evidence that the conduct of URS in terminating Pia and Oppat did influence the willingness of the local union to approve their return to the Iowa Fertilizer plant project." ECF No. 54 at 16. But Plaintiffs' claim that they will provide evidence at trial is not sufficient to withstand summary judgment. See Barber , 656 F.3d at 801. Similarly, it is not enough that Pia merely believed URS had something to do with the local union hall not wanting him to come back to work on the Project. The only evidence in the record that Plaintiffs point to for support that URS possibly had a hand in Plaintiffs not being hired by the new subcontractor is that union Business Agent Ellison participated in meetings with URS management prior to URS's decision to terminate Pia's employment. See ECF No. 54 at 14. This is simply not enough evidence to withstand summary judgment. See Anuforo , 614 F.3d at 807. Plaintiffs have not alleged any direct evidence to show they were not hired by the new subcontractor based upon anything URS did or did not do, and any circumstantial evidence is mere speculation. See Barber , 656 F.3d at 801. Thus, the Court concludes Plaintiffs have not demonstrated a genuine dispute of material fact on this issue and, as a matter of law, Defendant URS cannot be held liable for the period following the termination of its subcontract on the Project on April 17, 2015. Accordingly, the Court grants Defendants' motion as to this issue.
2. Plaintiff Pia's Back Injury
Defendants claim any back pay to which Plaintiff Pia may be entitled should also be limited due to his disability status as a result of an injury following his termination. On April 15, 2015, Pia injured his back in a non-work-related accident and did not return to work until April 2016. ECF No. 48-2 ¶ 43. During the time he was unable to work due to his back injury, Pia collected $57,408 in disability benefits that he received through the State of California from contributions he had made into *879 the fund while working on projects in California through his local union. Id. ¶ 44; ECF Nos. 54-1 ¶ 44, 54-2 ¶¶ 32, 33.
Pia asserts he was injured carrying boxes down the stairs during his relocation from Iowa to California following his alleged wrongful termination, and that, had his employment not been terminated, he would not have relocated and consequently injured his back. ECF Nos. 54-1 ¶ 43; 54-2 ¶¶ 32, 34. Plaintiffs argue a jury could reasonably find that but for his wrongful termination, Pia would never have been injured. Although Pia concedes that the disability benefits he received during the time he was unable to work should be offset from any back-pay award he receives, he nevertheless contends that the amount he received in disability benefits was far less than what he would have received for his work on the Project. ECF No. 54 at 18.
The remedy in a retaliatory discharge action is intended to make a plaintiff whole and compensate him for any losses he suffered as a result of his employer's wrongful conduct. Courts have held, however, that it "does not extend to granting back pay for a period when a plaintiff would have been unable, due to an intervening disability, to continue employment." E.g. , Thornley v. Penton Pub., Inc. , 104 F.3d 26, 31 (2d Cir. 1997). The Court concludes a jury could not reasonably infer that Defendant URS's alleged wrongful termination of Plaintiff Pia caused his injury and therefore URS would still be liable for back pay during the period of time he was not working due to his disability. Accordingly, Defendants' motion for summary judgment is granted as to this issue.
IV. CONCLUSION
Defendants' Motion for Summary Judgment (ECF No. 48) is GRANTED as to Defendant AECOM. With respect to Defendants' arguments that Plaintiffs' claims are pre-empted by the LMRA, the Motion is DENIED. Defendants' request that the Court reconsider its prior Order determining that Plaintiffs' claims are not pre-empted by the NLRA is also DENIED. Furthermore, as to Defendants' contention that Plaintiffs have failed to demonstrate a genuine issue of material fact that their complaints of safety violations on the jobsite were the determining factor in Defendant URS's decisions to terminate their employment, Defendants' Motion is DENIED. Finally, Defendants' Motion with regard to limiting damages is GRANTED.
IT IS SO ORDERED.

Plaintiff Pia filed a Complaint on June 1, 2016. Pia v. URS Energy & Constr. et al. , No. 3:16-cv-00045, ECF No. 1. The following day, Plaintiff Oppat filed a virtually identical Complaint alleging similar facts and the same claim against Defendants. Oppat v. URS Energy & Constr. et al. , No. 3:16-cv-00046, ECF No. 1. The Court subsequently granted Defendants' unresisted motion to consolidate the cases for all purposes including trial and directed that all future filings in the cases be entered in case number 3:16-cv-00045. ECF No. 39. With the foregoing in mind, all citations to the record prior to the consolidation of the cases are to case number 3:16-cv-00045.

In Plaintiffs' Statement of Facts they assert that the reason for Pia's termination "[p]resumably ... relates back to discipline he received [on December 31, 2014,] for asking for a forklift to reposition a 17,000[-pound] pipe he was beveling where the weight of the pipe exceeded the capacity of the forklift." ECF No. 54-2 ¶ 19; see ECF No. 54-5 at 7. Plaintiffs note that Pia was suspended for three days for the incident and that Pia had no other disciplinary actions against him prior to his termination. ECF No. 54-2 ¶ 19. Defendants respond that the disciplinary action that resulted from the incident on December 31, 2014, was not what led to Pia's termination, but rather, "Pia was terminated because he could not provide any safety concern that URS could resolve that would make Pia feel safe on the job, and therefore, he was not able to perform the duties he was hired to perform." ECF No. 66 ¶ 19.

Oppat asserts he was never formally disciplined for throwing the tooling away. Id. ¶ 37.

Indeed, Judge Hornby, a district court judge for the District of Maine, convincingly suggests the name "summary judgment" should be changed to "motion for judgment without trial." 13 Green Bag 2d at 284.

Judge Hornby notes that over seventy years of U.S. Supreme Court jurisprudence gives no hint the summary judgment process is unconstitutional under the Seventh Amendment. Id. at 281 (citing Parklane Hosiery Co. v. Shore , 439 U.S. 322, 336, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979) and Sartor v. Ark. Natural Gas Corp. , 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967 (1944) ). While Judge Hornby recognizes not much can be done to reduce the complexity of the summary judgment process, he nonetheless makes a strong case for improvements in it, including, among other things, improved terminology and expectations and increased pre-summary judgment court involvement. See id. at 283-88.

In Norris , the Court determined whether a state-law claim for retaliatory discharge was preempted by the Railway Labor Act (RLA), 45 U.S.C. § 151 et seq. The Supreme Court has noted that the preemption standard utilized in cases involving the RLA "is virtually identical to the pre-emption standard the Court employs in cases involving § 301 of the LMRA." Norris , 512 U.S. at 260, 114 S.Ct. 2239.